1

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF COLORADO
 2

 3    UNITED STATES OF AMERICA,     .   Case No. 22-mj-00068-GPG-1
                                    .
 4             Plaintiff,           .
                                    .
 5    vs.                           .   Wayne Aspinall Federal Bldg.
                                    .   400 Rood Avenue
 6    ANTHONY JAMES ROMERO,         .   Grand Junction, CO  81501
                                    .
 7                                  .
               Defendant.           .
 8    . . . . . . . . . . . . . .   .   April 29, 2022
                                        11:00 a.m.
 9
            TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
10        GORDON P. GALLAGHER, UNITED STATES MAGISTRATE JUDGE

11    APPEARANCES:

12    For the Plaintiff:            U.S. Attorney's Office -
                                      Grand Junction
13                                  By:  Peter Grattan Hautzinger
                                    205 North 4th Street
14                                  Suite 400
                                    Grand Junction, CO  81501
15                                  (970) 241-3843

16    For the Defendant:            Federal Public Defender's
                                      Office - Denver
17                                  By:  Jared Scott Westbroek
                                    633 17th Street
18                                  Suite 1000
                                    Denver, CO  80202
19                                  (303) 294-7002

20    Court Recorder:               Clerk's Office
                                    U.S. District Court
21                                  901 19th Street
                                    Denver, CO  80294
22

23

24

25
```

1   Appearances Continued:

2   Transcription Service:          AB Litigation Services
                                    216 16th Street, Suite 600
3                                   Denver, CO  80202
                                    (303) 296-0017
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1                                INDEX

2

3

WITNESS                 Direct    Cross    Re-Direct    Re-Cross

DANIEL PORTER              7        29         --           --

                                                          Page

Closing Argument by Mr. Westbroek                 69
Closing Argument by Mr. Hautzinger                70

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    (Time noted:  11:00 a.m.)

2              THE COURT CLERK:  Please rise.

3              THE COURT:  Please be seated.  Good morning,

4    everybody.

5              MR. WESTBROEK:  Good morning, Judge.

6         (Brief pause)

7              THE COURT:  All right.  Are we on the record?

8              THE COURT CLERK:  We are.

9              THE COURT:  All right.  Good morning, everybody.

10   We're on the record.  This is case 22-mj-68, the *United*

11   *States versus Mr. Anthony James Romero*.  Mr. Romero is here

12   in custody with his counsel, Mr. Westbroek.  Mr. Hautzinger

13   is here for the government.  We're set today for a

14   preliminary hearing and a detention hearing.

15              Is that how we're going to use our time, Mr.

16   Westbroek?

17              MR. WESTBROEK:  Yes, sir.  I think that'd be

18   appropriate.

19              THE COURT:  Okay.

20              Mr. Hautzinger?

21              MR. HAUTZINGER:  Yeah.

22              THE COURT:  Go ahead and proceed.

23              MR. HAUTZINGER:  I assume we'll go with the

24   preliminary hearing first, and then deal with detention after

25   that.

1              THE COURT:  Yes, please.

2              MR. HAUTZINGER:  Okay.

3              The government would call U.S. Postal Service

4    Inspector Daniel Porter to the stand.

5              THE COURT:  Okay.

6              Anything preliminarily, Mr. Westbroek, from you?

7              MR. WESTBROEK:  Yes, sir.  Before Mr. Porter gets

8    on the stand, I guess.  Can we have Mr. Romero's handcuffs

9    removed so he can assist me writing notes, that sort of

10   thing?

11             THE COURT:  I will leave that up to the Marshals.

12             MR. WESTBROEK:  They've said no, but I need him to

13   be able to assist.

14             THE COURT:  Okay.

15             MR. WESTBROEK:  That's something that's common in

16   --

17             THE COURT:  Marshal Estes (phonetic)?

18             THE COURT OFFICER:  Yeah, it's against our policy,

19   Your Honor, unless it's in trial.  It is a judicial order

20   that's in effect.

21             THE COURT:  Okay.

22             MR. WESTBROEK:  They do it in Denver, and they

23   also do it in Durango.  I just had it done two days ago.

24   I've had it done every time I've been in Denver.

25             THE COURT:  Is Mr. Romero right-handed or left-

1    handed?

2                MR. ROMERO:  Right-handed, sir.

3                THE COURT:  Marshal, what's the -- what's your

4    procedure with regard to one hand for purposes of writing?

5                THE COURT OFFICER:  If you order it, Your Honor,

6    we can release a hand.

7                THE COURT:  Let's do one hand, please.  Whatever

8    the writing hand is.

9                MR. HAUTZINGER:  Thank you, Judge.  Appreciate

10   that.

11               THE COURT:  Absolutely.

12               All right.  Anything else preliminarily?

13               MR. HAUTZINGER:  No.

14               THE COURT:  Okay.  I'm sorry.  Postal inspector

15   you said?

16               MR. HAUTZINGER:  Daniel Porter.

17               UNIDENTIFIED MALE:  Porter.

18               THE COURT:  Porter.  All right.  Special Inspector

19   Porter, come on up.

20               Go ahead and raise your right hand.

21               Do you solemnly swear or affirm the testimony

22   you're about to give in the matter now before the Court is

23   the truth, the whole truth about, and nothing but the truth?

24           (No audible response)

25           Whereupon,

```
 1                          DANIEL PORTER

 2         was duly sworn.

 3              THE COURT:  All right.  Please have a seat.  And

 4   then go ahead and state your full name, first name and last

 5   name.

 6              THE WITNESS:  First name, Daniel J. Porter.

 7              THE COURT:  And go ahead and spell each of those

 8   for us.

 9              THE WITNESS:  D-A-N-I-E-L, middle initial J,

10   Porter, P-O-R-T-E-R.

11              THE COURT:  All right.  Mr. Hautzinger, your

12   witness.

13              MR. HAUTZINGER:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15         BY MR. HAUTZINGER:

16         Q.   Good morning, sir.  Can you please tell Judge

17   Gallagher how you're employed?

18         A.   I'm employed with the U.S. Postal Inspection

19   Service as a federal agent here in Grand Junction covering

20   the Western Slope with the Denver narcotics team with the

21   inspection service.

22         Q.   How long have you been so employed?

23         A.   With the Inspection Service, since 2017.

24         Q.   Do you have previous law enforcement experience?

25         A.   No.
```

1      Q.   How long have you been based here in Grand

2   Junction?

3      A.   For about seven months now.

4      Q.   And what are your specific job responsibilities?

5      A.   To investigate illegal contraband mailed through

6   the U.S. Mail system, be it narcotics, firearms, investigate

7   assaults on U.S. Postal employees, burglaries, robberies, and

8   mail theft and identity theft.

9      Q.   In February of this year, where you engaged in

10  monitoring suspected narcotics packaging?

11     A.   Yes, I was.

12     Q.   And can you describe for the judge how that came

13  to be?

14     A.   We have mail covers in place, and basically any

15  narcotics that fit a certain profile, be it paid in cash or

16  coming from source locations, such as Arizona, California, or

17  Southwest border states, I was investigating return and

18  address activity with those -- those specific addresses.

19     Q.   Specifically, on February 25th of this year, 2022,

20  did you identify some suspicious mailings that were being

21  sent to 478 Bing Street in Grand Junction?

22     A.   I did, yes.

23     Q.   And what was suspicious about them?

24     A.   Again, the parcels were paid for in cash.  They

25  were addressed to a good name and address with the targets,

1 | but the return addresses were associated with fictitious
2 | names and associated with what are called "commercial mail
3 | receiving agencies" on the border, which are basically ways
4 | that people can get a PO box but they distance themselves
5 | from any physical residence and they just serve as a drop
6 | point.  And in this case that -- the CMRA was located
7 | directly across from the border in Nogales, Arizona, with
8 | Mexico.
9 |      Q.   Now, were you monitoring or inspecting specific
10 | databases of the U.S. Postal Service to identify these
11 | packages?
12 |      A.   Yes.  I get spreadsheets that come in based on
13 | cash payment parcels, or express, or priority, which is the
14 | fastest way to ship.  And usually narcotics are used with
15 | that service because, again, it gets there quicker and it's
16 | -- it doesn't have to be delivered specifically to an
17 | individual, it can be rushed.  But there's multiple databases
18 | that -- that feed into that -- that profiling.
19 |      Q.   And in reviewing those databases, were you able to
20 | identify a specific number of parcels that had been sent from
21 | Nogales, Arizona to 478 Bing Street in Grand Junction?
22 |      A.   Yes.  With this one we intercepted prior to that,
23 | there was approximately nine shipments averaging close to
24 | three pounds, with this most recent one being closer to four
25 | pounds, but there was activity, those nine parcels going

1   there, and then there was also a handful, I would say two to

2   three, very recently, going back from Grand Junction and

3   Clifton to that exact same shipping address.

4        Q.   And were you able to identify what was being

5   shipped from Grand Junction back to Nogales?

6        A.   No.  At this point I suspected that it was bulk

7   cash, or payments for narcotics, but, no, no verification.

8   We hadn't seized any at this point.

9        Q.   Was there anything of note to you as a U.S. Postal

10  inspector about the address or the location coming from

11  Nogales, Arizona?

12       A.   Again, yes.  It was located in what we call a

13  CMRA, the commercial mail receiving agency, which often are

14  not associated directly with the Postal Service, only through

15  the fact that they have to authorize -- become a commercial

16  authorized handler of mail.  But the fact that multiple

17  parcels going back were addressed to different PO boxes at

18  that address, as well as from where they were sending the --

19  there's a lot of cooperating individuals, most likely at that

20  source, but also in the inspection service databases, that I

21  was deconflicting with, meaning trying to see if any other

22  investigators were monitoring that location.  There was at

23  least six other active investigations into that address in

24  Nogales, Arizona.

25       Q.   You said six active investigations.  Is that just

1    Postal Service, or is that all federal law enforcement?

2         A.   In a lot of instances it's either a direct postal

3    inspector investigation, or it's a joint investigation with

4    the task force, on this instance OCDETF, cases out of

5    Phoenix, and some ties to targets, or suspected targets,

6    being monitored out of Ohio.  And again, other locations that

7    were most likely receiving stuff.

8         Q.   Let's switch our focus back to 478 Bing Street in

9    Grand Junction, Colorado.  Did you do some research into that

10   address?

11        A.   I did.  Aside from pulling the historical parcel

12   data and finding the -- only a year grasp, there was the --

13   the inbounds coming from Nogales.  I did some just basic

14   verification of current residents, previous change of address

15   information.  Just basic vetting of the location, as well as

16   physical surveillance.

17        Q.   Were you able to determine who the current

18   residents of that address were?

19        A.   I was.  It was --

20        Q.   And can you tell Judge Gallagher that?

21        A.   It was Anthony Romero and Jolene (phonetic)

22   Romero.

23             THE COURT:  I'm sorry, what was the second name?

24             THE WITNESS:  Jolene Romero.

25             THE COURT:  Thank you.

1       BY MR. HAUTZINGER:

2       Q.   Does she have a maiden name of Scaro (phonetic)?

3       A.   Scaro, yes.  Yes.  The assumption was obviously

4  that they're -- they were they were married, but for

5  identification purposes, Scaro is what I call her.

6       Q.   Did you actually do a drive-by of the residence on

7  February 28th of 2022?

8       A.   I did.  And I observed Jolene standing in the

9  entrance of the residence on a phone, and pulled the vehicle

10 license plates that came back to both Anthony and Jolene.

11      Q.   Did you also reach out to local state law

12 enforcement concerning that address and those individuals?

13      A.   I did.  They also did physical drive-bys and

14 verification and ran their databases to verify that they had

15 current residence and contact, or knowledge of the

16 individuals.

17      Q.   And did you talk to the Western Colorado Drug Task

18 Force about Anthony Romero?

19      A.   I did, yes.

20      Q.   And what did you learn from them?

21      A.   That there was obviously an incident back in 2015-

22 2016, that some of the -- or the Mesa County Sheriff's Office

23 and Grand Junction Police Department investigators had

24 personally been a part of.

25      Q.   And in addition to your communications with local

1  law enforcement, have you researched Mr. Romero's criminal

2  history on Colorado State Courts?

3          A.   I have, yes.

4               MR. WESTBROEK:  Judge, I'm going to object.  I

5  don't see the relevance of what his prior criminal history is

6  as to whether there's probable cause to establish a violation

7  of these offenses.

8               THE COURT:  Okay.

9               Mr. Hautzinger?

10              MR. HAUTZINGER:  I think it is directly relevant

11 to the 922(g) charge, and it's also relevant to the issue of

12 detention.

13              MR. WESTBROEK:  Judge, we can deal with that at

14 detention.  If you want to stipulate that he has a prior

15 felony, we'll certainly do that.

16              THE COURT:  Okay.  I'm going to allow it.  The bar

17 for relevance is low in a preliminary hearing stage.  We have

18 the 922(g) charge, the government doesn't have to stipulate

19 if they don't want to, so -- or accept a stipulation, so I'm

20 going to allow the testimony.  It's also more efficient to

21 have that now.  I can separate that in my mind for purposes

22 at the detention hearing portion of this, that if we get to

23 that later.

24              MR. WESTBROEK:  Yes, sir.

25          BY MR. HAUTZINGER:

1      Q.   Does Mr. Romero have prior felony convictions?

2      A.   He does.

3      Q.   Was he convicted in 2016 of felony menacing, a

4  Class 5 felony?

5      A.   Yeah.

6      Q.   Was he also convicted in 2015 of vehicular

7  eluding, a Class 5 felony?

8      A.   Yes.

9      Q.   And was he also convicted of second degree assault

10  with a deadly weapon, in 2015, a Class 4 felony?

11      A.   Yes.

12      Q.   And on the last case, was he sentenced to eight

13  years in the Department Of Corrections?

14      A.   Yes.

15      Q.   And did he receive three-year sentences to the

16  Department Of Corrections on the previous case?

17      A.   Yes.

18      Q.   So having established that background information

19  concerning the address on Bing Street, the pattern of

20  packages having been mailed there, some other packages being

21  mailed the opposite direction from Bing Street back to

22  Nogales, Arizona, did you initiate an investigation in terms

23  of keeping your eyes open for additional packages, or

24  something of that nature?

25      A.   Yes.   There's a system where we can annotate the

1   specific inbound address, so aside from continually

2   monitoring, I was alerted of the shipment coming directly to

3   478 Bing.

4          Q.   And on April 13th of this year, did you receive a

5   notification of a parcel headed to the Bing Street address?

6          A.   I did.

7          Q.   Can you describe that for the judge?

8          A.   The parcel itself, or --

9          Q.   Well, the information you received.

10         A.   Oh.  Basically, destination address, sending

11  location, so origin, zip code, and weight of the parcel.  But

12  shortly thereafter, I was able to recover the -- the physical

13  parcel itself.

14         Q.   Prior to recovering the parcel, though, you were

15  notified through the system that the parcel weighed

16  approximately three pounds, was addressed to Tony Romero, 478

17  Bing Street, and had a return address of Jessica Martinez

18  (phonetic) in Nogales, Arizona?

19         A.   Until I physically saw the package, I only knew

20  that it was coming from Nogales, Arizona.

21         Q.   Headed to 478.

22         A.   Headed to 478 Bing, yes.

23         Q.   Okay.  Then on April 15th of this year, were you

24  able to actually physically intercept that parcel?

25         A.   I was.

1      Q.   And can you describe for the judge how that

2   happened?

3      A.   I went to the processing facility where all the

4   inbound parcels are sorted and it was located in a box

5   waiting to be handed off to the delivery unit here in Grand

6   Junction, and it matched everything that I had on the, sort

7   of, inbound alerts, and I seized the parcel and brought it to

8   my office for the next steps.

9      Q.   Can you describe for the judge who it was

10  addressed to and what the return address was?

11     A.   It was from Jessica Martinez at 82 Terrace

12  (phonetic), Post PMB, which is post mailbox, I believe 355.

13  I can't recall it the PO box number because they fluctuate.

14  Nogales, Arizona, to Tony Romero at 478 Bing Street, Grand

15  Junction 81504.

16     Q.   Did you conduct a visual and physical examination

17  of the parcel?

18     A.   I did.

19     Q.   And did you notice any anomalies?

20     A.   Yeah.  It was heavily taped.  It was -- after

21  seeing the return address, I verified it was a fictitious

22  name.  And well, yeah.

23     Q.   Well, when you say a fictitious name --

24     A.   Uh-huh.

25     Q.   -- what do you mean by that?

1      A.    That name was not associated with that address

2   through any of the databases that I had access to.

3      Q.    So, I mean, it's conceivable somebody named

4   Jessica Martinez --

5      A.    Yes.

6      Q.    -- actually mailed it --

7      A.    Yes.

8      Q.    -- but there is not somebody named Jessica

9   Martinez who's actually associated with the address of 82

10  North Terrace Avenue --

11     A.    No.

12     Q.    -- in Nogales?

13     A.    Not that I could find.

14     Q.    Okay.  What else did you notice about the package?

15     A.    It was handwritten, and obviously because it's

16  sent priority it has a tracking number, so there's ability

17  for anybody to -- to track that item, be it the sender or the

18  recipient.  The edges were taped.  It had a sort of

19  centralized weight, but it was -- clearly something was kind

20  of bouncing on the -- on the inside of it, but pretty

21  regular, just priority parcel.

22     Q.    Based on your training and experience, was there

23  anything significant about the way the subject parcel was

24  paid for?

25     A.    Yeah, it was paid for in cash.  That's pretty easy

1    to -- to verify, but obviously no way to track credit card

2    data and/or retrieve surveillance footage from the shipper

3    because of the third party processing at the CMRAs.  They

4    have no obligation to, aside from get a yearly check that

5    they they're accredited, they have no records retention.

6         Q.    Did you take any steps to further inspect the

7    parcel with the assistance of local law enforcement?

8         A.    I did.  I had a Grand Junction police K-9 run his

9    dog on the parcel.

10        Q.    Is that a K-9 trained to alert to controlled

11   substances?

12        A.    It was, yes.

13        Q.    And who was the officer involved?

14        A.    Joey Gonzalez (phonetic).

15        Q.    And the K-9's name?

16        A.    Merlin (phonetic).

17        Q.    Okay.  And can you describe what happened, or how

18   that took place?

19        A.    Yeah.  So I retrieved the parcel, I isolated it in

20   my office.  I had other special agents from the DEA and ATF

21   mock up parcels that were of the exact same size.  They were

22   all placed facedown, four feet apart, in a hallway, and the

23   K-9 was called in after everything was set up, and then he

24   let his dog just run on the parcels.

25        Q.    And did Merlin alert to the subject parcel?

1    A.    Officer Gonzalez confirmed that, yes.

2    Q.    And he's the trained handler --

3    A.    He's the trainer of --

4    Q.    -- of Merlin, the drug tracking dog?

5    A.    Uh-huh.

6    Q.    What did you do next?

7    A.    At that point, I submitted for a federal search

8 warrant for the parcel based on all of the circumstances

9 prior, and the positive, or the K-9 alert.

10    Q.    And was that submitted to Magistrate Judge Gordon

11 Gallagher?

12    A.    It was.

13    Q.    And did he approve the search warrant?

14    A.    He did.

15    Q.    Did you then execute the search warrant on the

16 parcel?

17    A.    Yes.  Present were the DA agent and the ATF agent,

18 and we opened the parcel at the post office.

19    Q.    Can you describe for Judge Gallagher what you

20 found inside the parcel?

21    A.    Inside the parcel was a black bag that was wrapped

22 around the other contents, and inside the black bag was a

23 black and golden white poncho, a pink jump rope still in the

24 package, and then a blue flower.  I forget the brand name,

25 but it was a stacking toy, and clearly the corner edge of it

1    had been repackaged, but inside of that was the narcotics.

2         Q.    What is a stacking toy?

3         A.    I don't know.  I'm just sort of describing it, but

4    I would think of it as, you know, round peg, square peg.

5    These things were certain shapes, can be repositioned on this

6    toy, but it was clearly for a young child.

7         Q.    But it had clearly been opened and resealed or --

8         A.    Yes.

9         Q.    -- reshut, I guess?

10        A.    Yup.

11        Q.    And what was inside of that toy?

12        A.    So after you lifted the face of the toy, there was

13   a vacant space, and inside the vacant space was two fist-

14   sized, black bundles.  And I don't know if it was tape or

15   rubber, but just rock hard bundles.

16        Q.    And was there anything, based on your training and

17   experience, significant about the way those were packaged?

18        A.    Yeah, they were clearly secreted, so not, you

19   know, exposed.  So they were hidden inside the -- the item,

20   but wrapped -- there was clearly some internal wrapping aside

21   from the black so something was protectively holding the

22   contents.

23        Q.    And then did you open those packages and inspect

24   the contents?

25        A.    I did not directly open those, just based on what

1    we assumed they were, for the fear of exposure.  But the DEA

2    agent and the ATF agent, under a protective hood at the

3    Western Slope Colorado Drug Task Force building, did open it

4    and there were blue pills underneath the black plastic.

5         Q.    Were those blue pills labeled M30?

6         A.    Yes.

7         Q.    And did they weigh approximately 391 grams?

8         A.    Yes.

9         Q.    And has the DEA agent told you that based on his

10   training and experience, he believes them to be fentanyl,

11   counterfeit M30 pills?

12        A.    He did, yes.

13        Q.    And is confirmatory forensic testing ongoing at

14   the DEA laboratory in California now?

15        A.    Yes.  He submitted them.

16        Q.    What took place next in this investigation?

17        A.    After the confirmation that we had the narcotics

18   seized, I started prepping an anticipatory search warrant

19   based on a controlled delivery of the parcel to 478 Bing.

20        Q.    And did you submit that request for an

21   anticipatory search warrant to Judge Gallagher?

22        A.    I did.

23        Q.    And was it approved?

24        A.    It was.

25        Q.    What else did you do to prepare for the controlled

1    delivery?

2         A.    Aside from notifying local agencies and doing our

3    operations plans and procedures, I commandeered a U.S. Postal

4    Service vehicle and --

5         Q.    You commandeered?  You had to kidnap it, or --

6         A.    No.  Yeah.  No, but I have done it countless

7    times, but I mocked up as the postal carrier and prepared to

8    deliver the parcel, with local law enforcement standing by.

9         Q.    Now, did you make alterations to the actual parcel

10   prior to doing the controlled delivery?

11        A.    Yes.  We removed the narcotics, obviously, because

12   they were sent for testing.  We wanted that quickly returned.

13   But we placed inside of it a white powder sham, basically

14   what we call it is a "decoy," to facilitate the weight, and

15   then, also, a bag of sand was placed in there to ensure that

16   it was as close to the original weight, and then resealed it.

17        Q.    And was it done that way for both public safety

18   and official policy reasons, rather than delivering the

19   actual fentanyl to --

20        A.    Yes.

21        Q.    Okay.  Can you describe for Judge Gallagher how

22   the actual controlled delivery went down?

23        A.    Yes.  So I approached the door, rang the doorbell.

24   A young female opened the door, and then Jolene Scaro-Romero

25   came up behind.  And I asked if Tony was present, and she

 1   took the parcel from my hand and said, that's my husband.

 2   And I said, have a great day.

 3        Q.   And then you walked away from the house?

 4        A.   Yep.   I walked away and communicated to the nearby

 5   authorities that the parcel was received and had entered the

 6   residence.

 7        Q.   And was that the condition of the anticipatory

 8   search warrant that Judge Gallagher had approved, that namely

 9   the parcel being delivered and accepted, that triggered the

10   ability to execute the search warrant?

11        A.   Yes.   That was one of the conditions.   The other

12   was that Tony himself would receive it.   So, yes.

13        Q.   And did you been you then, you and local law

14   enforcement and federal partners, then execute a search

15   warrant?

16        A.   Yes.

17        Q.   And can you describe that for the judge, please?

18        A.   Local SWAT team surrounded the location, called

19   out any individuals that were inside.   Obviously there was

20   Tony, Jolene -- and I apologize, I don't know the children's

21   names, but there was two children that came out.   They were

22   secured, the building -- or the residence was also secured,

23   and then Tony was transported to the Mesa County Jail for

24   interview.

25        Q.   Had you also previously submitted to Judge

 1   Gallagher an affidavit in support that a criminal complaint

 2   for the arrest of Tony Romero?

 3        A.    I did, yes.

 4        Q.    And was he arrested pursuant to that complaint?

 5        A.    Yes, he was.

 6        Q.    Was he transported at the Mesa County Sheriff's

 7   Office?

 8        A.    Yes.  One of the deputies, in a marked unit,

 9   transported, and then myself and a DEA special agent

10   conducted the interview.

11        Q.    And can you describe that interview for the judge?

12        A.    It was audio and video recorded in one of the

13   interview rooms.  I was lead interviewer, while the DEA agent

14   was just taking notes, and basically confirmed Anthony's

15   basic identifiers, date of birth, residence, if he was

16   married to Jolene, and then read him his Miranda rights, and

17   then asked some questions after that.

18        Q.    And did he agree to speak to you after Miranda?

19        A.    Yeah.  He acknowledged his rights, and I could

20   tell he was very confused obviously of what was going on, but

21   I had told him I could explain it, and he answered questions

22   up to a certain point.  And then once I started asking about

23   the sender in Nogales, he invoked his rights to have a lawyer

24   present.

25        Q.    Did you ask him what he was expecting in the

1   subject parcel?

2         A.   He said some ponchos for his kids.

3         Q.   And did you ask him whether he had opened the

4   package?

5         A.   I did.  I asked him if he had opened it and where

6   he had opened it, and he said in his room.

7         Q.   His bedroom?

8         A.   His bedroom.

9         Q.   And did he say what he found inside the parcel?

10        A.   He said he was surprised when he found a bag of

11  sand.

12        Q.   And did you then ask him who had sent the subject

13  parcel to him?

14        A.   I did.  I asked if it was a family friend or

15  someone that was even related or a friend of Jolene's, and he

16  just said some friends down there.

17        Q.   It was from a friend?

18        A.   From a friend.

19        Q.   And then when you tried to ask him more specific

20  information about who or -- who that friend may or may not

21  have been, is that when he asked for a lawyer?

22        A.   Yes.

23        Q.   Did you also ask him about combinations for gun

24  safes in his bedroom?

25        A.   I did.  We were trying to relay as quickly as

1   possible, obviously I wasn't at the location, what we could

2   get into, because I was getting communication that there was

3   some gun safes.  And he told me that there was a key for the

4   large, green safe where his shotgun was, and then he didn't

5   think the small safe he had anything in there.  But he

6   mentioned that there was a code, but we, at that point,

7   weren't going to try to -- he couldn't recall, so we were

8   going to, you know --

9        Q.   You said there was a combination for the other

10  safe, but he couldn't remember the combination?

11       A.   Yes.

12       Q.   Okay.  So meanwhile, while you're interviewing the

13  defendant at the Mesa County Sheriff's Office, were your

14  partners and local law enforcement executing the anticipatory

15  search warrant?

16       A.   Yes.  At that point, they were already in the

17  search phase and were focusing mainly on the Anthony and Tony

18  -- or Tony and Jolene's bedroom.

19       Q.   I'm going to ask you to describe for Judge

20  Gallagher what was found during the execution of that

21  warrant.

22       A.   There was miscellaneous, just a handful of, I

23  think, some Xanax, a little bit of marijuana residue, and

24  things of that nature.  There was a receipt for one of the

25  suspect -- suspected money parcels going back to Nogales in

1    Jolene's purse dated August 6th -- or sorry, April 6th, so

2    just a week.   And then there were, I believe, two guns in the

3    green safe that Tony had mentioned, and then there was six

4    other firearms smattered across in different storage

5    locations.   So a total of eight firearms in the bedroom.

6          Q.    How about ammunition?

7          A.    There was about 700 rounds I recovered, and that's

8    what the ATF agent I had been working with here verified, but

9    multiple calibers obviously matching the firearms that were

10   found.

11         Q.    You just reference, working with an alcohol,

12   tobacco, and firearms agent here in Western Colorado,

13   correct?

14         A.    Yes.

15         Q.    And have you asked that individual to do -- well,

16   first off, who is it?

17         A.    Special Agent Kent Owens.

18         Q.    And as he conducted a ATF, interstate nexus

19   analysis, on all eight of the firearms?

20         A.    He did, yes.

21         Q.    And has he determined that all eight of them had

22   traveled in interstate commerce prior to being recovered from

23   the defendant's home?

24         A.    He did, yes.

25         Q.    In fact, all eight of them were manufactured in

1   locations outside of the state of Colorado, correct?

2        A.    Yes, I believe so.

3        Q.    Have you monitored some jail calls between the

4   defendant and Ms. Scaro?

5        A.    I have.

6        Q.    And was there a reference to -- oh, I'm sorry.

7   Was there something of note about one of the pistols

8   recovered, a .45 caliber Glock 21?

9        A.    There was.  It came back in a Mesa County stolen

10  firearms report, with a handful of other arms that were not

11  at the location, but one of the pistols was reported stolen

12  in, I believe, 2019.  I might be wrong on that date.

13       Q.    And did you monitor a recorded jail call between

14  the defendant and his wife about that firearm?

15       A.    I did.

16       Q.    And can you describe that for the judge?

17       A.    Basic conversation was, because on the search

18  warrant inventory it had listed that -- the annotator of the

19  evidence control annotated that that specific Glock was

20  reported stolen, and Jolene was asking Anthony like, hey, did

21  you know that was stolen, or something.  And he said, no, I

22  didn't.  I bought it online.

23       Q.    Finally, you had previously described for the

24  judge putting together the sham contents of the subject

25  parcel and the bag of sand.  Do you remember that?

1        A.    Uh-huh.

2        Q.    What was recovered during the execution of the

3   search warrant?

4        A.    The bag of sand was found in the garbage can

5   directly inside the bedroom.  And the next day, the Mesa

6   County Sheriff's deputy -- I forget his name, but the Mesa

7   County Sheriff's Office received a call from a concerned

8   neighbor in the area that they had found our other part of

9   the sham in their yard.

10        Q.    So that was the bag containing the white powder?

11        A.    Yes.  Yes.

12        Q.    And that had been dumped over the fence in the

13   neighbor's yard?

14        A.    Yes.

15        Q.    And that was recovered the next day?

16        A.    It was.

17              MR. HAUTZINGER:  I don't have any further

18   questions, Your Honor.  Thank you.

19              THE COURT:  All right.  Thank you.

20              Mr. Westbroek, cross-examination.

21              MR. WESTBROEK:  Yes, sir.

22                        CROSS-EXAMINATION

23   BY MR. WESTBROEK:

24        Q.    I apologize.  Do you go by Detective Porter,

25   Investigator Porter?

 1          A.    Inspector Porter.

 2          Q.    What would you prefer?

 3          A.    Inspector Porter.

 4          Q.    Okay.  Just making sure --

 5          A.    Yeah.

 6          Q.    -- I'm getting the right.

 7                So let's go back over some of the testimony that

 8    you gave, and then I want to go through the affidavit that

 9    you submitted.

10          A.    Of course.  I said, sorry, of course.

11          Q.    No, you're good.  I'm deaf and my hearing aids

12    aren't working right now.

13          A.    Oh.

14          Q.    So they're -- if I ask again that's why.

15          A.    Okay.

16          Q.    You've been in Grand Junction for seven months --

17          A.    Yes.

18          Q.    -- working with the Postal Service?  Where did you

19    work before that?

20          A.    Fresno, California.  Fresno, California.

21          Q.    Okay.  And was that the longest tenured place you

22    were at?

23          A.    Yes.  Prior to, or after the academy, I was

24    directly stationed in Fresno for approximately five years.

25          Q.    Okay.

1        A.    Oh, thank you.

2        Q.    And you said part of your job is investigating

3   suspicious packages?

4        A.    Uh-huh.

5        Q.    And those packages were determined suspicious

6   based on particular characteristics?

7        A.    Coming from source cities, again paid for in cash.

8   There's -- there's a lot of identifiers that we sort of try

9   to check the boxes on, again even wasting our time, there's

10  millions and billions of pieces of mail coming through --

11       Q.    Does --

12       A.    -- daily, so.

13       Q.    I apologize.  So is there an algorithm that these

14  databases use that you're talking about?

15       A.    No, not really.  Unless I'm specifically

16  requesting there is an -- it's not an algorithm, it's

17  analysts that sort of focus on targeted source states or

18  express parcels.  But in this case, I basically run what's

19  called a daily mail volume report, and I'm physically looking

20  at everything based on the profile parameters that I have

21  been trained to focus on.

22       Q.    And did you say you run that every day?

23       A.    Yes.

24       Q.    Okay.  And when you run those reports, does it

25  indicate under each parcel that's coming if there have been

1  other parcels sent to that address or from the same sender?

2      A.   No.  I have to physically go in and then pull

3  another separate address history report on the destination

4  address.

5      Q.   Okay.

6      A.   So I just get a daily input of what's coming, and

7  then based on, again parameters, I focus on different

8  addresses.

9      Q.   Okay.  And those -- remind me what those

10 parameters are that you focus on that initial sheet.

11     A.   Weight, source state, how the parcel was paid for,

12 and then any prior activity that we've had, be it other

13 inspectors, you know, monitoring, seizures that have been

14 related, or verification of the return address, and then that

15 sort of spider webs again into that.  So if there's been any

16 activity, basically.

17     Q.   Does that information show up on that sheet?

18     A.   On the address history report?  No.

19     Q.   Well, I guess the report that you receive every

20 day.

21     A.   Some, the express one it does.  It shows if there

22 has been prior seizures.  If there has been, and -- yeah, it

23 just sort of depends, but some of -- some of the ones will

24 annotate previous interactions.

25     Q.   Okay.  And in this case did it annotate a previous

1   interaction, the one that you ran with Mr. Romero --

2        A.   No.

3        Q.   -- that started this investigation?

4        A.   No.  Aside from the return address information

5   that I started looking at, the inbound activity, there had

6   been no previous seizures or anything related to that, so.

7        Q.   Okay.  And so let's talk about some of the

8   characteristics that indicate it needs further investigation.

9        A.   Uh-huh.

10        Q.   One of those is that it's a three-pound package,

11   or similar.  Is that right?

12        A.   Yeah.  Well, just basically if it's less than a

13   pound, or small ounces, it's not going to be a substantial

14   amount of, you know, contraband usually.  So if -- the

15   training and experience I've had, a lot of the items are

16   grouped with other things to secrete the narcotics, or mask

17   it.  But weight-wise, that is a certain indicator, again, to

18   focus on.

19        Q.   So if it's between one pound, and what's, I guess,

20   the top end of that range?

21        A.   Forty pounds.

22        Q.   Forty pounds?

23        A.   Yeah.

24        Q.   Okay.  How many packages come through the Postal

25   Service that fit within that range?

1      A.   Quite a bit, but I'm only targeting what's local.

2  So I mean, as far as, like, what goes across the country

3  every day, I think I referenced, I mean, there's billions of

4  --

5      Q.   Right.

6      A.   -- packages that are processed.

7      Q.   So anything that comes into Grand Junction?

8      A.   Anything that comes into the Western Slope.  But

9  again, once I've sort of built my target list, I was focusing

10  on Grand Junction at this point.

11      Q.   Okay.  So let's talk about that.  You built a

12  target list before the package came through?

13      A.   Because I run it every day, I know who's getting

14  what and certain -- again, reverse profiling of these

15  addresses.  I triage.

16      Q.   Got you.

17      A.   Yeah.

18      Q.   So Mr. Romero was on that list?

19      A.   At this point, I already had the mail watch up,

20  because I had been monitoring parcels going back to Nogales,

21  Arizona, as well as the 28th of February, when I drove by and

22  saw Jolene the previous day, they had received an express

23  parcel from Nogales.

24      Q.   Okay.  So --

25      A.   So I was already monitoring that location.

1    Q.   Because there was a package that came from Nogales
2  and then something that went back?

3    A.   Yes.

4    Q.   And any activity that -- any investigation that
5  led you to think Mr. Romero or that address was involved in
6  something before that date?

7    A.   Aside from just conversations with the local
8  investigators, as far as known drug activity and things of
9  that, no.  I hadn't intercepted any parcels or done anything,
10 because in this instance the fear was either that, you know,
11 the case would be we over, or I would just basically seize
12 the narcotics.  There wouldn't be any investigation, it would
13 just be a seizure.

14   Q.   Got you.  So you talked to local law enforcement
15 before you got the list together?

16   A.   Yeah.  And it's not really, you know, so much as a
17 list as just a working format.  I don't have, you know,
18 profiles of individuals yet, it's more just the addresses.
19 But they had communicated previous interactions, and like I
20 said, some of them had personally been present during the
21 incident in 2015 with Anthony.

22   Q.   Got you.  So they wanted you to look at Mr.
23 Romero?

24   A.   No, they just gave me background information.
25 It's protocol to, me being the only inspector here, I have to

1   heavily rely on multiple agencies, and they on me, for

2   information.  So aside from my checks of criminal history

3   verifying residence, physical surveillance, I just asked if

4   anybody had any history.  Meaning, you know --

5        Q.   So I apologize.  I'm confused on the timeline.

6   Did that happen before Mr. Romero's package was flagged, or

7   after?

8        A.   This one that was seized?

9        Q.   Before you started monitoring his address.

10       A.   It was after that February 25th, sort of, kickoff.

11  I want to say February 28th is when I physically talked to

12  the other law enforcement agents.

13       Q.   So you didn't know what was going on criminally

14  with Mr. Romero before that?

15       A.   I had ran, again, my own NCIC database checks and

16  verified that, but yeah.

17       Q.   Okay.  All right.  So we talked about the return

18  address and the to address, I guess, going from Nogales to

19  Grand Junction, and then something going back.  Did it say

20  Clifton in your report?

21       A.   It was shipped out of Clifton, and there's no

22  surveillance cameras there.  But, yes, Clifton the -- the

23  gray area between Fruitvale, Grand Junction, and what's

24  technically Clifton or not, but the -- what I'm referencing

25  is the post office in Clifton was the originating zip code

1   and where the parcel was paid for.

2          Q.    The one going back?

3          A.    Yes.

4          Q.    Okay.  So, well, I'll have to apologize, I don't

5   know where Clifton is in relation to Grand Junction.

6          A.    Yeah.

7          Q.    How far away is that?

8          A.    It's basically a part of it.  It's on the eastern

9   side of the city.  It's sort of goes Grand Junction,

10  Fruitvale, Clifton, but it's more, I would say, the entire

11  east side edge, prior to going to Palisade, which is on the

12  I-70 run.

13         Q.    Got you.

14         A.    So it's five minutes away from here, maybe 10.

15  Specifically, that post office is about 10 minutes, 12

16  minutes.

17         Q.    And those packages that were going back, who were

18  they addressed to?

19         A.    A few of them -- I'd have to look up the images,

20  but not Jessica Martinez.

21         Q.    Was it the same person, always?

22         A.    No.

23         Q.    And did you know the weight of those packages?

24         A.    The last one I believe this one -- excuse me, on

25  the 6th was about 1.2 pounds, sent priority.  Again

1   (unintelligible) tracking, but, yeah.  The average weight of

2   them was around a pound.  I would say one to one and a half

3   pounds.

4        Q.   And did you intercept any of those packages?

5        A.   No.  Not yet.

6        Q.   So you don't know what was in them?

7        A.   No.

8        Q.   Okay.  When you said "not yet," are you in the

9   process of --

10       A.   Well --

11       Q.   -- getting some?

12       A.   Well, you know, again, every time sort of

13   something triggers a snowball, we'll see if similar activity

14   happens.  But I would doubt that there would be any more

15   money going back at this point.

16       Q.   And there was no way to understand -- or no way to

17   know what was in those packages at this point?

18       A.   No.

19       Q.   Okay.  Thanks.

20            All right. So we talked about the weight, address,

21   and if it's paid for in cash.  Is that right?

22       A.   Uh-huh.

23       Q.   How many parcels that are sent through the mail to

24   Grand Junction are paid for in cash?

25       A.   I couldn't give you a full average on that.  Not

1   as much as there are otherwise.  But again, I -- to give you

2   a rough estimate of what I'm pulling just daily, I would say

3   50 to a 100 approximate parcels.

4        Q.    Coming in every day?

5        A.    Coming in every day.

6        Q.    Paid in cash?

7        A.    From the target locations I'm monitoring.

8        Q.    Okay.  And how many going back that are paid in

9   cash?

10        A.    Again, we don't -- unless I know that -- the way

11   the system works is that I only know inbounds.  So unless I

12   am targeting those specific return addresses, I wouldn't know

13   the outbounds.  But, yeah, I would assume because the

14   population's smaller here, that I couldn't give you an answer

15   on that, no.

16        Q.    Okay.  You're only looking at those that are

17   coming to specific addresses that you're looking for at that

18   point, right?  Is that what you were saying?

19        A.    I'm monitoring everything, again for the entire

20   Western Slope.

21        Q.    Okay.

22        A.    And then once I do my vetting and database

23   searches, then that's when I focus --

24        Q.    Okay.

25        A.    -- on the specific --

1    Q.    So the 100 or so packages, as a guestimate, that

2    deals with only those addresses that you're monitoring?

3    A.    Yes.

4    Q.    Okay.  And that's not the entire Western Slope, or

5    it is the entire --

6    A.    It is.  It's zip codes that start with 811 --

7    Q.    Got you.

8    A.    -- through 816.

9    Q.    Okay.  And these, the packages that we were --

10   that you were looking at for Mr. Romero, there was

11   approximately nine of those packages in the past?

12   A.    That had been delivered, yes.

13   Q.    Okay.  And the weights were all the same on each

14   of those?

15   A.    They were not all the same.  The average was about

16   three pounds.

17   Q.    And so did -- what was the range, I guess?

18   A.    Probably .8, slightly less than a pound, to the

19   highest being -- this 3.8 pounder might have been the

20   highest, but, yeah, the range was some -- less than a pound

21   express parcels, to the most recents I would say in the last

22   five deliveries, we're all about three pounds, priority, flat

23   rate they're called, white boxes.

24   Q.    Got you.  And you don't know what was in those

25   packages, either?

1      A.    No, just suspected narcotics.

2      Q.    Okay.  And were there any other packages sent to

3  this address that were not express mail?

4      A.    Yes.

5      Q.    How many of those packages?

6      A.    I'd have to look at the address history report,

7  but if it was coming from -- there's -- there's ways to

8  verify if it's from a commercial mailer, so if it's coming

9  from Amazon or it's a Pitney Bowes or some sort of stamps.com

10  account, those are registered with vendor numbers and clearly

11  either verified or put to the side as far as monitoring.  But

12  there was quite a few other packages, obviously.  Everybody

13  gets --

14      Q.    So there was only nine within those parameters

15  that we talked about?

16      A.    Nine that I was focusing on a specifically from

17  Arizona.  I didn't focus on California or these others --

18  these other suspected source states that -- that I could see

19  were indicative of what I was looking at.

20      Q.    Got you.  And you were talking about a it coming

21  from one of those CMRAs?

22      A.    Uh-huh.

23      Q.    So that is an account set up by a company?  Or

24  kind of explain that to me.

25      A.    Yeah.  Well, a UPS store or FedEx.  I think FedEx

1   does it.  But funny enough, they had one in Fresno called

2   Going Postal.  But it's just these mom and pop shops that

3   basically they'll sell all FedEx, UPS, mail, shipping,

4   packaging services, but then they'll also have PO boxes that

5   people can pay to get physically sent to that location, and

6   that business is vetted and signs a contract with the Postal

7   Service to be an official handler of the mail.  And then

8   they're supposed to keep logs of every PO box holder, the

9   same way that's vetted locally.  So passports, driver's

10  license, things of that nature.

11          Q.    Okay.  So just to make sure that I understand.  My

12  daughter's in New Haven going to college --

13          A.    Uh-huh.

14          Q.    -- and she has one of -- it sounds like the same

15  sort of thing, where she gets the mail that we sent her at

16  that box.

17          A.    Uh-huh.

18          Q.    Is that --

19          A.    If it's a university or something, I mean, they

20  have these large community boxes and things of that nature

21  that goes to, you know, a mail room.  But in this instance,

22  it's a physical business that -- yeah, it's just walk in -- I

23  don't know if -- it's not a 24-hour lobby like most of the

24  federal post office buildings are, but it's accessible at any

25  time for these individuals to get their mail.

1      Q.   Got you.  And you said at these locations are

2  supposed to vet who opens the box, I guess?

3      A.   They're supposed to, yeah.

4      Q.   How often do they do that, then?

5      A.   Well, again, they're supposed to do it yearly.

6  The post office is supposed to send liaisons, being

7  supervisors or postmasters, to verify that there's even a

8  recordkeeping process.  But in this instance, I was notified

9  by inspectors and agents in Phoenix that this specific CMRA

10 is non-cooperative and do not keep records.

11     Q.   When you say you were notified by investigators in

12 Phoenix that the CMRA was not compliant with, what does not

13 compliant mean?  Wouldn't tell them who it was?

14     A.   We call it just being shady.  They don't keep

15 records of any business transactions, or they don't verify,

16 at least from what I was told, that they don't check IDs for

17 these individuals.  And often cases, there was people even

18 monitored crossing the border going to that CMRA shipping or

19 retrieving something, and then directly going back to the

20 border.

21     Q.   Okay.

22     A.   So residency needs to be physically attached to a

23 U.S. residence, and clearly there was evidence that that was

24 not being complied with.

25     Q.   Okay.  So it was monitored -- well, so was there a

1    bulletin that came out, or some sort of email saying that the

2    CMRA was having -- was shady?

3          A.    No.   Basically, when I run these address history

4    reports, I get hits of anybody that's previously investigated

5    or looked into or had these what are called "mail watches".

6    So I personally reached out to all of them to ask what

7    information they had.   And if, again, if someone's working a

8    larger investigation, which in this case one of the Phoenix

9    inspector was, they had indicated failed attempts at either

10   data recovery from the location, you know, the previously

11   mentioned issues.   But yeah, there's an annotation of who

12   directly looked at it, when, and why, if they put those notes

13   in there.

14         Q.    Okay.   So you contacted the Phoenix inspector?

15         A.    Uh-huh.

16         Q.    And what was his larger investigation?

17         A.    A OCDETF case linked to methamphetamine and M30

18   pills in Nogales.

19         Q.    Is that --

20         A.    He's assigned to the Phoenix division, but he

21   covers that area of responsibility, yeah.

22         Q.    Got you.   And his investigation involved those

23   same 30 pills that --

24         A.    I don't know if they're the same, but again --

25         Q.    Same type.

1      A.    Same type, yeah.

2      Q.    All right.

3      A.    The blue pills.

4      Q.    When you identified the packages going to Mr.

5  Romero's house, did you contact the DEA at that point?

6      A.    They were present when I was -- on the 20th of

7  February, approximately, they -- they knew that I was looking

8  into that address, or I was sort of trying to figure out when

9  the next parcel was coming in, or what -- what was happening

10  activity-wise.  But, yeah, they were notified.

11      Q.    Okay.  Same with the ETF, or was that later?

12      A.    ETF was later.  They're a part of the task force.

13  It's a very -- you know, everybody's in the same office, so.

14      Q.    Intertwined.

15      A.    Intertwined, yes.

16      Q.    Got you.  So were they with you when you monitored

17  the delivery of that February package?

18      A.    No.

19      Q.    Okay.  And you got -- did you guys know what was

20  in the February package?

21      A.    No.

22      Q.    Okay.  By the time that you started to monitor the

23  February package, that's when you talked to local law

24  enforcement?

25      A.    Yes.

1    Q.   And they told you about a 2015 incident involving

2    fentanyl?

3    A.   I don't know about not -- the 2015 incident I

4    believe was just about Anthony's previous cases.  The

5    information I received from Glenwood Springs DEA, who are not

6    housed here, but obviously communicate, had indicated they

7    had believed in 2019 there was some incident with M30 or

8    fentanyl overdose incident up there that was possibly

9    related.

10    Q.   That was possibly related?

11    A.   But it was just a conversation about they had --

12    again, I don't even -- I don't know if I have the report.  It

13    was just basically from an interview, or some phone dump

14    information, they had focused their eyes on either Anthony or

15    Jolene in regards to that.  They might have been related to

16    the individual or something, I have no idea.

17    Q.   So his name just popped up?

18    A.   Yes.

19    Q.   Okay.  And then you had reported in affidavit that

20    there were -- Mr. Romero was known to be involved in the drug

21    scene?

22    A.   According to them, both individuals were

23    suspected, or at least had had interactions with local law

24    enforcement, to be either users or associated with people

25    that were either dealing or using, and possibly themselves.

 1      Q.   So they were associated with people that were --
 2 they were suspected to be users at that point?
 3      A.   Well, I believe Jolene has previous drug charges,
 4 as well.  So that's an indicator that she was.
 5      Q.   Okay.
 6      A.   But as far as Anthony, nothing on the record.  But
 7 again, yeah, I don't know specifically on that.
 8      Q.   So you don't know what the involvement was with
 9 the local investigations?
10      A.   Not in that incident.  It was just the
11 conversation that had indicated that, yeah.
12      Q.   I apologize.  Not the 2019 incident --
13      A.   Uh-huh.
14      Q.   -- any other -- any other investigation that was
15 going on, you reported that there were other investigations
16 going on and that Mr. Romero and Ms. --
17      A.   Oh, not -- not going on with -- with them as far
18 as, like, active drug investigators.  It was just prior
19 interactions with them.
20      Q.   The 2019 case?
21      A.   Yes.
22      Q.   Okay.  So their names that just come up, nothing
23 --
24      A.   No.
25      Q.   And any ongoing investigation into that?

1          A.    No, not that I'm aware of.

2          Q.    Okay.  So the CMRA that we talked about was sent

3     from Jessica Martinez?

4          A.    That's the name that was written on there, yes.

5          Q.    Okay.  And was there an address associated with

6     Jessica Martinez, I guess --

7          A.    Not --

8          Q.    -- to identify who had the box?

9          A.    Not there.  And there's no records that are

10    maintained at the physical location, the CMRA, that would be

11    retrievable or they would cooperate with.  But the only

12    Jessica Martinez that -- obviously, that's a fairly common

13    name, came back to have no relations, even if we were looking

14    at the right one.  You know, there was at least five possible

15    Jessica Martinez's, but their age range was, you know, 18 to

16    78, so.

17         Q.    So you don't know who the Jessica Martinez was

18    that was --

19         A.    No.  But I know that that name is not associated

20    through the databases that I had access to, to that CMRA.

21         Q.    Okay.  Did you go interview anybody to see if

22    there was any Jessica Martinez related to that?

23         A.    No, I have not attempted that yet.

24         Q.    Okay.  So when you look at the nine packages that

25    were sent, are there any -- did they come from anyone else

1  besides Ms. Martinez?

2       A.   I would have to look back at some of the images,

3  but because the last ones that were sent express, they're not

4  visually screened, and oftentimes even though the one that I

5  intercepted would have not bypassed the ability to look at

6  that.  So I -- I don't know specifically who, but I do know

7  that where the -- the PO box that it's going back to is not

8  the same one that this one was coming from, at least in one

9  instance.

10       Q.   Okay.  So there were different PO box used?

11       A.   Yes.

12       Q.   Boxes.

13       A.   Yeah.

14       Q.   I apologize.

15       A.   PMBs.  Yeah, (unintelligible).

16       Q.   Say that --

17       A.   PMBs, or whatever they're called.  There's

18  different analogies, but it's -- again, they call them post

19  mailboxes instead of a PO box.  It's some legal term, I

20  guess.

21       Q.   Got you.  All right.  So you seized the package in

22  April?

23       A.   Uh-huh.

24       Q.   And it was -- you took it to your office?

25       A.   DEA, ATF, and myself transported it to my office

1  where I have a opening and scale and document -- everything's

2  set up to execute a warrant there, so.

3      Q.   Okay.  So describe the process of seizing the

4  package and taking it to your office.

5      A.    So because I was dirty, basically, I was the one

6  touching the suspected narcotic parcel, I handled that and

7  put it in the back of my vehicle.  They followed me.   I

8  brought it into my office, set it down to annotate the

9  information that I needed for the warrant, and then they, in

10  the opening room, opened up sealed, priority, flat rate,

11  large boxes, which match it, and then they set those aside.

12  And then when the K-9 handler -- excuse me, notified that he

13  was there, I placed the suspected parcel on the ground,

14  facedown, at that location.

15      Q.   So you don't have like a safe container when you

16  seize it that you put it in?

17      A.   No.  At that point, it's been -- I mean, it was --

18  it was in a box with about 40 other packages, and it's been

19  processed on the truck and things like that.  But no, I don't

20  have a specific ConCom, or what we call the sort of, like,

21  secured box to transport.  But I was the only one handling it

22  at that point.

23      Q.   Got you.  So it was in your vehicle that had 40

24  other packages that you had seized?

25      A.   Oh, no, no, no.  No.  The 40 packages I was

1   referencing, that was in a -- at the processing plant where

2   that parcel was found.

3        Q.   Okay.

4        A.   On top of -- they segregate them into these

5   containers, basically by zip code.  So it was on the top of

6   that.

7        Q.   Okay.

8        A.   In my car, it was just on the seat.

9        Q.   Okay.  Have you seized any other packages that you

10  put on the seat of your car?

11       A.   No.

12       Q.   That was the first one?

13       A.   Yeah.  This is my first one since I've been here.

14       Q.   Got you.  All right.  So then that's when -- and

15  the DEA were following you --

16       A.   Yup.

17       Q.   -- at that point?

18       A.   They followed me in their vehicles.

19       Q.   And once it was placed on your desk, or in your

20  office, that's when they came in with their protective box, I

21  guess?

22       A.   No.  I had the -- there's empty equipment and

23  completely isolated parcels that are still encase in, like,

24  packages of, like, six to eight, I think.  I instructed them:

25  cut that open, make me boxes with tape that was also with

1    that, and set those up in the hallway.

2          Q.,  Okay.  So those packages -- I apologize.

3          A.   Yeah.

4          Q.   I want to make sure I understand this process.

5    You brought the package into your office?

6          A.   Yes.  I brought that package into my office.

7          Q.   Okay.  And you said that you were the one that was

8    dirty?

9          A.   That's what we reference in regards to not

10   exposing any of the other nearby packages or --

11         Q.   I understand.

12         A.   Yeah.

13         Q.   And at that point, that's when the DEA came in to

14   the room?

15         A.   They went into the opening room, because I have

16   two separate offices.

17         Q.   Okay.

18         A.   They were in the opening room setting up the other

19   boxes that were mirroring that, the subject parcel.

20         Q.   The three other boxes.

21         A.   Yes.

22         Q.   And so they already knew this was going to happen.

23         A.   They knew that I was planning to have the K-9 run

24   on it, but they had never -- they had -- this is -- this,

25   usually -- I don't know how they do it, but they -- they

1    didn't know how I was going to set it up.  I just sort of

2    started ordering them to set that up, so.

3         Q.   Okay.  And so you said there were three other

4    dummy packages.  What did those look like?

5         A.   Exactly the same as the priority, large, flat

6    rate.  So they're -- you can go into any post office and they

7    have just those rows, and there's small, medium, large,

8    there's envelopes, but they're basically 10 by 10, white

9    boxes, with postal markings, they say "priority".  So they

10   were all taped on just one, I think, joining section, on the

11   top and bottom, and then there is sort of like a front side

12   you'd say, or a top side, and they were all facedown, placed

13   on the carpet.

14        Q.   Okay.  So were they taped the exact same as the

15   suspected box?

16        A.   Not as heavily taped on the front side, I believe,

17   but they whipped up just enough to secure, but I -- I can't

18   -- I don't remember if they were exactly taped the same.

19   They -- we didn't write on it.  You know, nothing to -- I

20   mean, the dog's not going to read that.

21        Q.   Sure.

22        A.   But, no, they're not.

23        Q.   Was there any --

24        A.   Sorry.

25        Q.   Was there any other marking on the -- on the

1  suspect package versus the other ones?  Like --

2       A.   There was the return and sender address, and then

3  there was a priority label printed from the PVI indicating

4  the weight and then the payment method.

5       Q.   Got you.  And so --

6       A.   And that was facedown.

7       Q.   Understood.  Did you put any weight in those

8  boxes?

9       A.   No.

10      Q.   Box of (unintelligible).

11      A.   Uh-huh.

12      Q.   Okay.  And so you were there and the DEA agent and

13  the ATF agent?

14      A.   Yep.  And then the PD --

15      Q.   Officer Gonzalez (phonetic), right?

16      A.   Officer Gonzalez, yes.

17      Q.   Who called Officer Gonzalez?

18      A.   Special Agent Jason Greenfield (phonetic) had his

19  direct number, but I believe they might have called dispatch

20  to find out who was available.  But he contacted Officer

21  Gonzalez.

22      Q.   And Agent Greenfield, he's the DEA agent?

23      A.   Yes.

24      Q.   Okay.  Were you there when Officer Gonzalez showed

25  up?

1        A.    Yes.

2        Q.    And you saw him work with the dog?

3        A.    I saw him retrieve the dog, and then I walked him

4   back to where it was at, and the other agents were monitoring

5   the parcels.

6        Q.    Okay.  And you talked -- so you talked to him as

7   you guys walked into the building?

8        A.    I said, nice to meet you.  I got everything set

9   up.  This is, you know, how I've done it in Fresno.  I just,

10  as soon as your dog gets hits this carpeted hallway, just do

11  whatever you need to do.  But, yeah, it was just cordial

12  conversation.  He -- I never met him, and I hadn't even met

13  the ATF agent prior to that day, as well, so.

14       Q.    Got you.  Did you tell him that there was a

15  suspected package in the room?

16       A.    No.  Just said he -- well, we just wanted to run

17  his dog on, you know, a parcel.  I didn't tell him it was a

18  subject parcel.  But in any instance that they're using a K-9

19  dog, I would assume that they're --

20       Q.    That he knows.

21       A.    -- knowing there's something that they are trying

22  to vet or not.

23       Q.    So did the DEA agent tell him anything?

24       A.    I have no idea.

25       Q.    Okay.  Was the dog let off the leash in the

1    hallway?

2         A.    Yes.    After he had walked through the, sort of

3    work room floor, he was unleashed.

4         Q.    Okay.    And did you watch the dog go and sniff the

5    packages?

6         A.    I did.

7         Q.    And so did he sniff each one?

8         A.    He only made it to the second parcel, and then he

9    absolutely just tore it apart, almost.

10        Q.    So he tore the package apart?

11        A.    No, I mean, he was scratching at it.

12        Q.    Okay.

13        A.    But he -- yeah, he went past the first parcel,

14   didn't even do anything.   And then the second parcel he,

15   according to Officer Gonzalez, alerted on it, which is

16   physically visible.   There are actually dog claw marks on the

17   bottom of the --

18        Q.    Sure.

19        A.    -- the parcel.

20        Q.    Did Officer Gonzalez give him -- the dog anything

21   after he alerted?   Like, how did he get the dog to come back

22   to him?

23        A.    He grabbed the -- the -- I'm trying to remember if

24   he directly grabbed him.   Often, I see them, there's a sort

25   of toy or something --

1      Q.   Uh-huh.

2      A.   A reward.

3      Q.   Yeah.

4      A.   I don't know if, you know, that was done directly

5  at that to confirm to get the dog's attention, or if he went

6  and physically grabbed it.  But he -- I was annotating the

7  time of the alert based on Officer Gonzales.

8      Q.   So after you saw the dog scratch the package, you

9  didn't see if Officer Gonzalez gave him -- gave the dog his

10 reward?

11     A.   No.  I just remember when we were kind of wrapping

12 it up he had a toy in the dog's mouth, which even when we

13 were locking up, he was sort of, handling that.

14     Q.   Before he was off leash?

15     A.   No, when he was on leash.

16     Q.   Okay.

17     A.   Yeah.  The only time he was off leash was when he

18 was running.

19     Q.   I apologize.  What I met was before the officer

20 let the dog off the leash, he had that toy in his hand?

21     A.   No.  In the back of his coat, or something.  Or

22 his, like, his -- his strap, but I --

23     Q.   Got you.

24     A.   I don't know where it was.  Yeah.

25     Q.   Thank you.

1       A.   I just remember seeing it.

2       Q.   All right.  So at that point, that's when you

3  submitted a warrant, or an application for a warrant to Judge

4  Gallagher?

5       A.   Yes.

6       Q.   And described what happened?

7       A.   There was -- it was approved.  But we were that --

8  like, after the warrant was approved, or what do you mean?

9       Q.   No.  After the dog alerted, is that when you

10  submitted the application?

11       A.   Yes.  Yep.

12       Q.   Okay.  And that was just to open the parcel?

13       A.   That was just to verify the contents.

14       Q.   Okay.  And you said when you opened the parcel,

15  the DEA agent, or the agents -- was that the DEA agent that

16  opened the parcel, and the ATF agent?

17       A.   I opened it, they were photographing it, and then

18  I booked it into my evidence immediately, without exposing

19  the black sort of outer wrapper, and then I immediately

20  transferred it over to both of them, and then they went back

21  and, under that protective hood in their evidence room,

22  sliced it open to see that they were the M30 pills, the

23  blues.

24       Q.   Okay.  And this, did they -- why did they think it

25  was M30 pills that were in there?

1          A.    I could feel that they were, there was pills.  It

2    didn't feel like methamphetamine.  It wasn't squishy or

3    anything that would indicate that it could have been, you

4    know, cocaine or heroin.  And just based on my training

5    experience, I --

6          Q.    Figured it was M30s.

7          A.    -- was pretty confident at what we were going to

8    intercept, so.

9          Q.    Okay.  And so, actually, it was at that point that

10   you applied for the search warrant, not -- or, sorry, no.  I

11   apologize.  No, we're good.

12          After you got that done, you started to apply for

13   another search warrant?

14          A.    Yes.  Yes.  For the residence.

15          Q.    The residence.

16          A.    Yeah.

17          Q.    And so I've never heard of a conditional search

18   warrant before, so I'm going to just ask you to describe

19   what, how you -- what you put in the affidavit and what --

20          A.    The anticipatory warrant?

21          Q.    -- how it was -- yeah, the anticipatory.

22          A.    Basically, it's contingent on triggering events,

23   which would have been the delivery of the parcel, but it's,

24   you know, everything that basically went into the parcel

25   warrant, the probable cause and that, reflects to the, in

 1   this case, suspect receiving no narcotics and trying to

 2   verify in the home if there was any further evidence of

 3   narcotics trafficking or cooperators.

 4        Q.   Okay.  So when you submit your affidavit, it says,

 5   we believe that this, that there's evidence in this house and

 6   probable cause will be established once Mr. Romero takes

 7   possession of the package.  Is that how that works?

 8        A.   Yeah.

 9        Q.   Well, once it's delivered --

10        A.   Yes.

11        Q.   -- and then once Mr. Romero takes possession.

12        A.   Yes.

13        Q.   Okay.  And who makes that decision at that point

14   to execute the search warrant?  Does it go back to Judge

15   Gallagher?

16        A.   Yes.   Yes.

17        Q.   So you -- so that anticipatory search warrant is

18   issued.

19        A.   Uh-huh.

20        Q.   Once you see both of those events happen, you

21   report back to Judge Gallagher and then he says, all right,

22   here's the search warrant?

23        A.   I mean, it was just presented as -- well, I'm

24   trying to think of what you mean by, like, going back to --

25        Q.   Well, I'll back up.

1        A.    Yeah.

2              MR. HAUTZINGER:  Your Honor, I'm going to object

3    at this point.  I think we're pretty far afield from probable

4    cause to believe that the charges in the complaint took

5    place.

6              MR. WESTBROEK:  Judge, Mr. Hautzinger opened the

7    door when he started questioning Agent Porter about this

8    exact thing, so we're going to -- if Mr. Hautzinger is going

9    to talk about it, let's talk about it.  And that's --

10             THE COURT:  All right.  I'll allow some limited

11   testimony on a very limited -- it really doesn't go to

12   probable cause.  I believe the door was slightly opened, but

13   to the extent that you want to address this in a Frank's

14   motion later, you'll get to --

15             MR. WESTBROEK:  Yeah.

16             THE COURT:  -- and at this point in time, we're

17   going to probable cause and we're getting well far afield at

18   this point.  So limited testimony, but that's it.

19             MR. WESTBROEK:  All right.  I got it.  Just a few

20   questions.

21        BY MR. WESTBROEK:

22        Q.    Before the package was delivered or received --

23        A.    Uh-huh.

24        Q.    -- you had applied for this anticipatory search

25   warrant?

1      A.    Before the parcel was delivered at the residence

2   --

3      Q.    Yes, sir.

4      A.    -- I had applied for the anticipatory, yes.  After

5   we verified the contents with the federal parcel warrant.

6      Q.    And that -- the issuance of that warrant was

7   contingent upon delivery and receipt by Mr. Romero?

8      A.    Or Jolene.

9      Q.    Or Jolene.

10      A.    Uh-huh.

11      Q.    You couldn't have executed the search warrant

12   unless those two conditions were met?

13      A.    Correct.

14      Q.    Okay.  So once those two conditions were met, did

15   you report back to Judge Gallagher?

16      A.    Did I report back immediately?

17      Q.    Did you have to report back?

18      A.    No, because the conditions were observed and

19   verified, and based on the knowledge that, you know, the

20   contents would have been, you know, discarded or it -- no, we

21   were already in preparation, again, to execute or to not.

22   But once those conditions were met, we executed.

23      Q.    Okay.  So as you start to execute the search

24   warrant -- well, let's back up.  Ms. Romero is the one that

25   actually received the package.  Is that right?

1        A.    Yes.

2        Q.    And did you see her give it to Mr. Romero?

3        A.    No.

4        Q.    Did you see Mr. Romero open the package?

5        A.    No, but he verified that he did.

6        Q.    But not at that point, right?

7        A.    No, because the door was shut.

8        Q.    Yeah.

9        A.    Yeah.

10       Q.    And officers showed up in some sort of tank

11  looking thing, I guess?

12       A.    BearCat, I believe that's the term.

13       Q.    Yeah.

14       A.    But it's the armored vehicle, yes.

15       Q.    Yeah, fully armed.  Were there any surveillance

16  cameras outside, do you know?

17       A.    There was a Ring camera.  From what I understand,

18  there was also some internal cameras in the bedroom and

19  things of that nature.  But, yeah, no, the only one I knew of

20  aside from the Ring camera was I think there was a corner

21  Nest or Ring camera.

22       Q.    Do you know if anyone tried to destroy those?

23       A.    I believe that the SWAT team, or one of the

24  agents, deactivated them.  I don't know how -- how they

25  handled that, but I did see the user interface separated from

1  the wall, which would have been the physical means to view

2  that versus obviously, you know, Smartphones or things like

3  that.

4        Q.   Got you.  When that BearCat showed up, did Mr.

5  Romero come out of the house?

6        A.   From what they told me, he did, yes.  I was --

7        Q.   Immediately?

8        A.   I was still in my postal uniform waiting to come

9  back.

10       Q.   So you weren't at the scene, or you --

11       A.   I was returning to the scene after the execution.

12  The way that it was handled, because of the threat matrix, or

13  whatever categorization of why the SWAT team was being

14  utilized, they had control of surrounding, call it, and

15  entry.  But then when I came back, I had the scene.  But

16  there was no physical way for me to -- to do that.  And

17  honestly, aside from people knowing that I was, you know, the

18  delivery person, we always try to protect postal employees.

19  The intent as to make it --

20       Q.   Got you.

21       A.   -- unobserved.

22       Q.   Okay.  And so he came out immediately, with his

23  arms up?

24       A.   I believe so.

25       Q.   Okay.  And then he was arrested?

 1          A.    He was, yes, he was arrested.

 2          Q.    And taken -- who took him to your office or

 3   wherever he was held?

 4          A.    I'd have -- I don't remember his last name, but it

 5   was a deputy with Mesa County.

 6          Q.    Okay.  And were you with that deputy?

 7          A.    I was not in the vehicle myself.  He was in the

 8   vehicle, I believe when I showed back up, and then I drove

 9   separately, and then DEA Special Agent Chris Lindsey

10   (phonetic) went with me back to the Mesa County Jail.

11          Q.    Okay.

12                THE COURT:  Give me just a moment, Mr. Westbroek.

13          (Judge confers with the clerk)

14                THE COURT:  Okay.  Go ahead, Mr. Westbroek.

15                MR. WESTBROEK:  Thank you, Judge.

16   BY MR. WESTBROEK:

17          Q.    So he was interviewed at the Mesa County Jail?

18          A.    Yes.

19          Q.    Okay.  Do you know if it was video recorded?

20          A.    It was video and recorded.  I also had a audio

21   recorder.  I haven't retrieved the video yet because of all

22   the other items that I've had to shore up at this point, so.

23          Q.    Understood.  He signed his -- you Mirandized him,

24   gave him his Miranda rights?

25          A.    Uh-huh.

1      Q.   He signed the form?

2      A.   He didn't sign the form, no.  I didn't have the

3  form.  The verbal verification on the recording was enough to

4  document --

5      Q.   Right.

6      A.   -- in my mind.

7      Q.   You said he was confused about -- well, let me ask

8  this.  When he agreed to talk to you, what was the first

9  question you asked him?

10     A.   Oh, what do you want to know?  I said, why do you

11  -- do you want to know why you're here?

12     Q.   And what did he say?

13     A.   Yes.

14     Q.   And then you asked him about the package?

15     A.   I said, I wasn't trying to be condescending.  I

16  was basically like, hey, I'm an inspector.  I know most

17  people don't know what that is.  I'm here with a DEA agent,

18  you can maybe assume that this may be involving some

19  narcotics.  So I sort of hinted that he was under

20  investigation based on the parcel that was delivered --

21     Q.   Yeah.

22     A.   -- 30 minutes prior.  And then I started asking

23  him about the parcel.

24     Q.   And he acted confused, or was -- said he was

25  confused?

 1          A.    He was confused on what was inside of it, but he

 2     wasn't confused about expecting it.

 3          Q.    So he anticipated -- he said he anticipated

 4     getting that package?

 5          A.    Getting some ponchos for his kids --

 6          Q.    That was --

 7          A.    -- I believe it was the --

 8          Q.    Sorry, I didn't mean to interrupt.

 9          A.    No, no.  I just believe that that was what he

10     said.  He's like, I thought it was ponchos for my kids.

11          Q.    So he said he didn't know what was in it, or did

12     he say anything about, you know, (unintelligible) --

13          A.    He just said when he opened it and it was sand, he

14     was confused.  I think those are the words that came out of

15     his mouth.

16          Q.    Got you.  And then you asked him who the package

17     came from?

18          A.    Yes.  I asked who Jessica Martinez was.

19          Q.    And then --

20          A.    No, actually, I don't think I asked her name

21     specifically, but who sent it, basically.

22          Q.    And that's when he said he wanted a lawyer?

23          A.    No.  He said it was a friend down there, I

24     believe.  And then I said, okay, is it a, like, close friend?

25     Is it family?  Is it Jolene's family or friend?  And then

1    that's when he said he didn't want to talk without a lawyer.

2         Q.    And it was after that that you asked him about the

3    shotgun?

4         A.    After he had invoked his rights, I just verified

5    again if there was any combos for the safe, and that's when

6    he had indicated that there was a shotgun in there.

7              MR. WESTBROEK:  Just one second, Judge.

8              THE COURT:  Sure.

9         (Brief pause)

10             MR. WESTBROEK:  No further questions, Judge.

11             THE COURT:  All right.  Mr. Hautzinger, any

12   redirect?

13             MR. HAUTZINGER:  No.  Thank you, Judge.

14             THE COURT:  Okay.  You may step down.

15        (Witness excused)

16             THE COURT:  Any further evidence, Mr. Hautzinger?

17             MR. HAUTZINGER:  Nothing further, Your Honor.

18             THE COURT:  Mr. Westbroek, any evidence?

19             MR. WESTBROEK:  No, sir.

20             THE COURT:  Okay.

21             Argument, Mr. Hautzinger, or do you want to

22   reserve for rebuttal?

23             MR. HAUTZINGER:  I'll reserve rebuttal.

24             THE COURT:  Great.

25             Mr. Westbroek.

1          MR. WESTBROEK:  If I can have another moment,

2   Judge?

3          THE COURT:  Sure.

4      (Brief pause)

5          CLOSING ARGUMENT BY MR. WESTBROEK

6          ON BEHALF OF THE DEFENDANT

7          MR. WESTBROEK:  Judge, I think there's two

8   potential issues with whether there's probable cause to bind

9   this over.  Number one is, while there was a package that was

10  in a controlled delivery, we don't have anything -- well, we

11  don't have anything indicating that Mr. Romero knew what was

12  in that package.  In fact, when Investigator Porter talked

13  about Mr. Romero's response he was surprised that that's what

14  was in there, that the sand was in there.  So presumably, he

15  would be surprised about any potential pills coming.  He

16  thought there were ponchos coming in.

17          We don't have any information about where that --

18  who put that -- who sent the package, who that person was,

19  what they put in the package, why Mr. Romero would have

20  expected to receive ponchos or why he would have accepted --

21  expected to receive narcotics.  We just know that there was a

22  package that was sent, the package that was received, and Mr.

23  Romero was surprised at the contents, that it was anything

24  more than ponchos.

25          I think based on that, we don't have enough

1    information to say that Mr. Romero was involved in some sort

2    of conspiracy to distribute any narcotic.  We just know that

3    there were some narcotics that delivered.

4              And long those lines, we don't know what those

5    suspected narcotics are at this point, they're off to the lab

6    to be tested.  Could they be?  Sure.  But there's field tests

7    that need to be conducted, we don't have any information

8    about that.  All we have is, this is what it looks like.

9    Maybe it was Certs, maybe it was Tic-Tacs, we don't know

10   until that report comes back.

11             With that in mind, Judge, I don't think that

12   there's probable cause to bind over the drug charges.

13             As to the guns, I would concede that there is

14   probable cause because there were guns found in that house.

15             And that's all I have to say, Judge.  Thanks.

16             THE COURT:  Thank you, Mr. Westbroek.

17             Mr. Hautzinger.

18               CLOSING ARGUMENT BY MR. HAUTZINGER

19                  ON BEHALF OF THE PLAINTIFF

20             MR. HAUTZINGER:  I would simply point out that

21   there's a lot more than one package being delivered to Mr.

22   Romero's address.  There is a pattern of nine packages over

23   the better part of a year, all weighing approximately the

24   same amount, and that someone's sending them to that address,

25   and they're being accepted at that address.  I think that is

1  ample probable cause of a conspiracy.

2           As to the drugs and the fact that forensic testing

3  hasn't been concluded yet, I think it's very clear that the

4  training and experience of the investigators and special

5  agents involved can distinguish M30 counterfeit fentanyl

6  pills from Tic-Tacs or other kinds of candy, and there's

7  ample probable cause to bind over the drug charge, as well.

8           THE COURT:  Thank you.

9           All right.  We're here today with regard, to at

10  least initially, a preliminary hearing as to three offenses.

11          Count 1, conspiracy, to distribute and possess

12  with intent to distribute controlled substances;

13          Count 2, use of a communication facility to commit

14  a felony drug traffic offense;

15          And Count 3, possession of a firearm by a

16  prohibited person.

17          All of those, at this juncture, charged by way of

18  an amended criminal complaint that's found in this matter at

19  Document 11.  I incorporate herein the entirety of the

20  testimony that's been provided today from Inspector Porter.

21          Without going through all of the details, there is

22  probable cause to establish each and every one of the

23  offenses.  We have an investigation here that stems back to

24  mid to late February of 2022, the address 478 Bing Street,

25  which is in the state and District of Colorado here in Mesa

1    County, was identified as an address receiving unusual or

2    suspicious packages based off of place of origin, that being

3    a parcel shop that essentially has a contract with the U.S.

4    Postal Service that ultimately meets the definition of a

5    communication facility based off of the contract and other

6    circumstances related to that facility.  That was unusual

7    based off of the location, the PO boxes, packages coming from

8    various PO boxes, and names not being associated necessarily

9    with those, in terms of return shipment.

10           We also have two to three return parcels of a

11   lesser weight going back to different PO boxes over the

12   period of the course of this investigation, and that all

13   triggered the inspector to take a closer look at this.

14           Ultimately, a package -- well, the inspector did

15   some groundwork, as well, found out the information regarding

16   the individuals living at this location, identified them to

17   be Anthony Romero and Jolene Scaro, or Jolene Romero.  Ran

18   license plates, did a physical drive-by at one point in time,

19   and confirmed Jolene Romero, or Jolene Scaro, who he saw on a

20   phone.  Did some prior investigation with regard to criminal

21   history for Anthony Romero and confirm several felonies from

22   2015 and 2016 that become relevant for other purposes later.

23           Then, a notification was received by the officer

24   with regard to a package on April the 13th of 2022.  The

25   officer recovered that parcel.  We've been walked through the

1  blind drug sniff that occurred by Merlin, the dog who was

2  handled by Officer Gonzales.

3       The package was picked out by the dog, which

4  actually scratched the outside of the packaging in its

5  excitement.  With regard to that, that being the second of

6  four packages that all looked essentially similar in this

7  circumstance.  Ultimately, the package was inspected and

8  inside of the package was found a couple of fist-sized

9  bundles that were packaged inside of a toy that was inside of

10 the package.

11      The toy wrapping had obviously been opened at some

12 point in time, which drew the attention of law enforcement to

13 that.  And trained law enforcement found two bundles, 391

14 grams of suspected blue pills that were marked M30 that are

15 similar, in their experience and training, to fentanyl pills

16 that have been sold on a regular basis and that they are

17 familiar with.  Those have been sent off for testing and were

18 opened in a secure fashion within the DEA's Office so as not

19 to essentially poison anybody during the process of opening

20 those.

21      Then, the package was delivered with fake weight

22 inside of it, sand, that was ultimately found discarded in

23 the bedroom and outside.  The officer has outlined the course

24 of how it was delivered, taken by Jolene and given to Tony.

25 Ultimately, Tony or Anthony, identified having received the

1  package as a package that he was expecting from somebody.

2  And then at that point, shortly thereafter, Mr. Romero

3  stopped asking -- or stopped answering any questions.

4          We also have sufficient information with regard to

5  the guns that were found.  Despite the confession by the

6  defense, there's ample evidence for probable cause for that

7  count, as well, based off of the location, the identification

8  from the defendant of the safe, and having a combo or a key.

9  I think that safe was opened by a key.  Some eight guns and

10 700 rounds being found in the defendant's bedroom.

11         Based off of the totality of the investigation,

12 the multiple packages, the delivery of the package in this

13 case to the Romeros, the opening of it by Mr. Romero, that he

14 was expecting this package, all of that provides ample

15 probable cause and I bind over each and every one of these

16 counts for further proceedings.

17         All right.  In terms of detention hearing, are we

18 ready to roll right into that, Mr. Hautzinger?

19         MR. HAUTZINGER:  Yes, Your Honor.

20         THE COURT:  Okay.

21         I have received and reviewed the pretrial services

22 report.  I think we confirmed that at our last hearing.  I

23 think the government had also received it, and at least at

24 that point in time, the defense had received, and I think was

25 going to take some time to review it with the defendant prior

1    to our hearing today.

2             Are you ready to proceed with regard to that, Mr.

3    Westbroek?

4             MR. WESTBROEK:  Yes, sir, I'm ready on that.

5             THE COURT:  Okay.  And is the --

6             THE COURT CLERK:  Probation Officer Cohen's on the

7    phone.

8             THE COURT:  Okay.  Mr. Cohen's on the phone.  Can

9    you hear us, Mr. Cohen?

10            MR. COHEN:  Yes, Your Honor.

11            THE COURT:  All right.  Fantastic.

12            All right.  Mr. Westbroek, do you want to have a

13   detention hearing today, or do you want to reserve that for a

14   later time?

15            MR. WESTBROEK:  I'd like to have it today, Judge.

16            THE COURT:  Okay.

17            Mr. Hautzinger, go ahead.

18            MR. HAUTZINGER:  Thank you, Your Honor.

19            The government is agreement with the conclusion of

20   the probation department, that there is no condition or

21   combination of conditions that will reasonably assure the

22   safety of the community.  The government believes it is

23   appropriate for this defendant to be detained, both on public

24   safety and risk of failure to appear grounds.

25            And frankly, Judge, I base most -- well, he has a

1  history of failure to appear, but his criminal history is,

2  frankly, pretty alarming.  All three of his felony

3  convictions involve firearms or deadly weapons, except for

4  the felony eluding, vehicular eluding, which I submit goes to

5  risk of failure to appear and public safety.

6           But he has a felony menacing from 2014 where he

7  had brandished a firearm, pointing a handgun at students at

8  Grand Junction -- Dairy Queen by Grand Junction High School.

9  Then the vehicular eluding, which kind of speaks for itself.

10          And what wound up being a second degree assault

11 felony was charged as attempted murder that involved the

12 defendant shooting the victim in the face.

13          Those, I submit, are three pretty serious and

14 pretty concerning prior felony convictions.  The last one,

15 the second degree assault, he received an eight-year DOC

16 sentence in 2015.

17          I don't have specific information as to exactly

18 when he was released, and I don't believe he's on parole now.

19 But those three prior convictions, coupled with the facts of

20 this case, both the amount of fentanyl involved and the sheer

21 number of firearms recovered from the defendant's home, eight

22 different firearms, none of which he had the legal right to

23 be possessing or have control of, again I'd submit is

24 alarming and concerning.

25          I think all of that combines to support

1   probation's conclusion that this defendant should be

2   detained.

3           And I have nothing further, Your Honor.

4           THE COURT:  All right.  Thank you.

5           Mr. Westbroek.

6           MR. WESTBROEK:  Yes, sir.

7           Judge, respectfully I would disagree.  There are

8   conditions in this case the Court can impose that would

9   assure both Mr. Romero's appearance in court, as well as his

10  -- as the safety of the community.

11          Now, let me start first with the issue about the

12  guns.  I know that Mr. Hautzinger wants to talk about that

13  evidencing some sort of danger.  However, those guns have

14  been seized.  They're not there for Mr. Romero to possess, do

15  anything with, so I think that's something to get out of the

16  way.

17          But if we look at the factors in this case that

18  the Court is supposed to consider for release, or conditions,

19  whether there are conditions, let's start with family ties.

20          Mr. Romero, as the Court can see, has eight people

21  in court today, all family members, close friends, including

22  his wife and children, his father, and his sister, in the

23  courtroom today.

24          He has strong community ties.  He works for his

25  father-in-law.  He works locally doing odd jobs.  He has been

1    in Grand Junction most of his life, I believe all of his life

2    he's been in Grand Junction.  He's not going anywhere. He's

3    from here.

4              When the Court considers the failure to appear,

5    that's from 2012, 10 years ago.  He was 20 years old.  That's

6    -- he's 30 plus now.  So I think that you have one instance

7    of this failure to appear.  That warrant was canceled after

8    he was arrested, and nothing after that.  And that was a

9    misdemeanor offense, so I don't think that it's fairly

10   indicative of what he's going to do in this case.  It's a

11   driving under restraint, so probably got a ticket and didn't

12   show up to court.  My son's done that.  It happens on

13   occasion.

14             What's I think more indicative of his failure to

15   appear, or lack thereof, is when you have these serious

16   felony charges that come down, he's in court, he's not

17   fleeing, he's not going anywhere.  So when the Court looks at

18   those, I think that's more indicative of whether he is a

19   flight risk.

20             I will also point out, Judge, that while Mr.

21   Romero does have a significant criminal history, I think it's

22   important to detail what has happened in those cases, at

23   least the most recent case.

24             So that felony alluding and assault case, the

25   second degree assault, they're part of the same instance, and

1   he was sentenced in both of those cases on the same day.  And

2   the government's right, he was sentenced to eight years in

3   prison, in 2015.  The Court understands that that goes to

4   2023, right?  So the question is, what happened in the

5   meantime?

6           Well, July of 2018, Mr. Romero was paroled,

7   specifically to ComCor here in Grand Junction.  While he was

8   in ComCor he had zero issues.  Zero.  He didn't fail a drug

9   test, he didn't fail to show up at the time he was required

10  to, his curfew, had a job, did everything that he was

11  supposed to do at ComCor and then was released out of ComCor

12  onto his own.

13          While he was on his own, again, no issues with

14  parole, no issues with testing positive, no issue with

15  breaking the law, no issue with anything.  And so what

16  happened then?  His parole was terminated early for good

17  behavior.  What that shows is that there are conditions that

18  the Court can set and that Ms. Romero will follow.  He's done

19  it.

20          He made a mistake.  He made mistakes in the past,

21  but that's not indicative of whether there are conditions

22  this court can impose that would assure the safety of the

23  community.  As we can see from that same history, there are

24  conditions that the Court can impose.

25          So when the Court considers that, in conjunction

1  with the fact that while probation is recommending detention,

2  they also put -- they also assign a percentage to what the

3  likelihood of Mr. Romero's success would be, and that's they

4  put a 71 percent chance on that.  That's almost three-fourths

5  of the time, these people that have the same criminal history

6  category have the same type of charge, that they're

7  successful.

8         And I will say, Judge, that, that -- their PTRA,

9  which I just learned how that worked a couple of days ago,

10  their PTRA score, I don't think is accurate, completely

11  accurate I would say, in determining what the danger to the

12  community is posed by Mr. Romero, or his risk of flight.

13         And that would be for one simple reason.  If the

14  Court looks at the administrative office study of anybody

15  that's granted pretrial release, specifically pretrial

16  release for those people where there's a presumption that

17  applies, so they're facing major charges, less than 1 percent

18  of those people in the District of Colorado commit a new

19  offense.  Less than 1 percent.

20         So what we would have to say is that based on Mr.

21  Romero's history, he's going to be part of that less than 1

22  percent.  The problem is is that we've already seen that

23  there are conditions that work, so he's not fitting in with

24  that less than 1 percent that pose a danger to the community.

25  There are conditions the Court can use.

1    Second, as to the risk of flight, less than an 8

2    percent flee.  So more likely than not, he has above a 90

3    percent chance of being successful.  He has no incentive to

4    flee in this case.  His family's here, his wife is here, his

5    children's here, his father's here, his sister's here.  He's

6    not going to go anywhere.

7    I think the most important factor for the Court to

8    consider, again, is that he complies with conditions of

9    release.  He did it before and he'll do it again, and I think

10   it's more than appropriate in this case to release Mr. Romero

11   on bond.  So I'd ask the Court to release him.

12   THE COURT:  All right.  Thank you, Mr. Westbroek.

13   All right.  We're here on the three counts that I

14   discussed earlier.  Probable cause has been found as to each.

15   With regard to Mr. Romero's criminal history, it's

16   been discussed, but there's some driving history, a failure

17   to appear warrant on a case out of 2012.  Frankly, things got

18   serious in 2014, that matter, at a younger age, as the

19   defense mentioned, involved a felony menacing with a weapon

20   that the defendant was convicted of, placed on probation.

21   Ultimately, that failed and the defendant ended up with a

22   prison sentence.

23   There was a vehicular eluding case in 2015 with

24   another prison sentence run concurrent.

25   And then the 2015 case that started as an

1    attempted murder that ended up as a second degree assault,

2    again with a firearm.  The unrebutted allegation is that the

3    victim was shot in the face, and that was the case that

4    results in an eight-year Department of Corrections sentence

5    that, at least the latter portion of that, is not unusual,

6    transformed into a community corrections sentence, and then a

7    parole sentence, or parole period.  The Court's been provided

8    with no information as to when that ended, or if it has ended

9    at this juncture or not.

10              In this case, the underlying case that we're here

11   on, the evidence is strong.  The defendant was receiving an

12   extremely dangerous substance in M30 fentanyl pills that were

13   received.

14              The evidence also for which the defense confessed

15   that there's probable cause, but even without that the

16   evidence was extremely strong, that there were eight total

17   firearms of various types found in the defendant's bedroom

18   and 700 rounds of various calibers matching those firearms,

19   at least to some extent.

20              Anything else going on in this case, the defendant

21   clearly knows that he's got three prior felonies, at least

22   two of them involving a firearm, one of them involving

23   shooting somebody in the face.  Frankly, it would be

24   outrageously irresponsible of me to find that the defendant

25   isn't a danger to the community by a clear and convincing

1  standard.  He is a danger to the community by a clear and

2  convincing standard.

3          I'll also note that while family support has been

4  mentioned, that the family support presumably was here before

5  when this occurred, at least allegedly, in the house that

6  he's sharing with his wife and children, which are that

7  support system.

8          I'm not terribly worried about appearance.  The

9  burden for that is much lower, it's a preponderance standard.

10 I do find by a preponderance that there's no condition or

11 combination of conditions that will ensure the defendant's

12 appearance in court, but I'm far more concerned about danger

13 to the community.

14         I find by a clear and convincing standard that

15 there's no condition or combination of conditions that will

16 ensure the safety of the community.  You are remanded, Mr.

17 Romero, to the custody of the United States Marshal's Service

18 with no conditions of release.

19         And Marshal, you're going to re-cuff Mr. Romero?

20 Thank you.

21         All right.  When are we needing to look at coming

22 back on this in terms of date calculation, Mr. Hautzinger,

23 and preliminary hearing?

24         MR. HAUTZINGER:  Your Honor, I'd like to set this

25 for a return sometime after May 19th.  I expect to have an

1   indictment by then.

2         THE COURT:  I can get you in on the 20th.  I have

3   a limited amount of time left.  I have a slot at 8:00 in the

4   morning that day, then we start a couple of hour pretrial

5   conference on a civil matter.  Otherwise, it's going to have

6   to be the following week.

7         You wouldn't necessarily need to be out in person

8   for that, Mr. Westbroek.

9         MR. WESTBROEK:  Is that May 20th, Judge?

10        THE COURT:  The Friday morning, the 20th, I could

11  offer you an eight o'clock or an 8:30 time.

12        MR. WESTBROEK:  I can do it via ETC --

13        THE COURT:  Oh, yeah, I'm anticipating -- I'm

14  anticipating that there's going to be potentially an

15  indictment or indictments.

16        MR. WESTBROEK:  Yeah.

17        THE COURT:  And we're just going to be looking at

18  arraignment and trial setting at that point in time, and an

19  advisement.

20        MR. WESTBROEK:  Okay.

21        THE COURT:  So we can do discovery conference,

22  memorandum, and order remotely.  I hate to have you fly out

23  here for a 10-minute appearance.

24        MR. WESTBROEK:  I drove, so --

25        THE COURT:  Or drive.  I mean, it's not that it's

1    not a nice drive, but, you know, after doing that a couple of

2    times last week, it's also exhausting.  So that may not be --

3    and you may have other things you need to do for other

4    clients.

5              MR. WESTBROEK:  Yes, sir.

6              THE COURT:  So 8:30 that morning work for

7    everybody?

8              MR. WESTBROEK:  Yes, sir.

9         THE COURT:  What's your thoughts on your client

10   appearing?  Well, the jail won't do us by video at 8:30 in

11   the morning, will they?

12        (No audible response)

13             THE COURT:  Okay.  So we'll address that.

14             MR. WESTBROEK:  Mesa County, as well.

15             THE COURT:  Yeah, I think our time -- I think our

16   videos slots with them are all in the afternoon.

17             Okay.  Mr. Romero, sir, you will be back in court,

18   then, the morning of May 20th at 8:30 for further

19   proceedings.

20             Consistent with those orders, Mr. Westbroek,

21   anything else you think I need to address?

22             MR. WESTBROEK:  Not at this time, Judge.

23             THE COURT:  Okay.

24             MR. WESTBROEK:  I think Mr. Hautzinger and I want

25   to talk to you after --

1              THE COURT:  Okay.

2              MR. WESTBROEK:  -- briefly about Mr. Martinez, to

3     let him know about the (unintelligible).

4              MR. HAUTZINGER:  Yeah, we have another hearing

5     that was supposed to start (unintelligible).

6              THE COURT:  Yeah, we've got -- I mean, I'm happy

7     to chat with you, but we've got somebody -- give me a moment.

8     Let me get us from the calendar first.

9              MR. WESTBROEK:  I was just going to let the Court

10    know that I asked Mr. Hautzinger this morning if we could --

11    if he would object to moving that hearing.  I ended up having

12    to go to Tulsa for another case I had there.  I was just

13    putting it on the Court's --

14             THE COURT:  Sure.  I'm sorry.

15             MR. WESTBROEK:  -- (unintelligible).

16             THE COURT:  What hearing are we looking at and

17    what date?

18             MR. WESTBROEK:  May 25th, we have a change of plea

19    scheduled in Robbie Martinez's case, and the Court was going

20    to -- Judge, you were going to be in Denver.

21             THE COURT:  Sure.  That's fine with me.

22             MR. WESTBROEK:  I was just let --

23             THE COURT:  I think you got that Tulsa duty that

24    everybody's rotating through.  Yeah.  I mean, that's just the

25    way it goes.  Nothing you can do about that.  So if you --

1          MR. WESTBROEK:  I just wanted the Court to know

2    for its calendar.

3          THE COURT:  Okay.  If you all want to just

4    coordinate with Ms. Barnes, she can get a new date on the

5    books.  In terms of a Denver date, if that's where we're

6    going to do it, we'll have to figure that out later.

7          We may have to figure that out when I'm back next

8    week, Ms. Barnes.

9          MR. WESTBROEK:  Perfectly acceptable.  Thank you.

10          THE COURT:  Okay.  But we can certainly vacate it.

11    If there's a notice plea in that addresses speedy trial as

12    far as we need to deal with, and we'll just get it back on

13    the books for another date.

14          MR. WESTBROEK:  Yes, sir.  Thank you.

15          THE COURT:  Okay.  Absolutely.

16          Anything else, Mr. Hautzinger?

17          MR. HAUTZINGER:  No.  Thank you, Your Honor.

18          THE COURT:  Okay.

19               (Time noted:  12:45 p.m.)

20                    * * * * *

21

22

23

24

25

1                        CERTIFICATE

2       I, RANDEL RAISON, certify that the foregoing is a

3   correct transcript from the official electronic sound

4   recording of the proceedings in the above-entitled matter, to

5   the best of my ability.

6

7

8   _____          June 1, 2022

9   Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25