IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COLORADO

Criminal Case No. 1:22-CR-166 (GPG)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ANTHONY JAMES ROMERO,

    Defendant.

---

## ANTHONY JAMES ROMERO'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE/DEPARTURE TO A SENTENCE OF TWENTY-FOUR MONTHS' IMPRISONMENT FOLLOWED BY THREE YEARS OF SUPERVISED RELEASE

---

Mr. Romero, by and through undersigned counsel, files this Sentencing Memorandum and, pursuant to 18 U.S.C. § 3553(a), respectfully requests this Honorable Court impose a sentence of twenty-four months of imprisonment, followed by three years of supervised release. The requested sentence is appropriate because, considering Mr. Romero's unique background, a sentence of twenty-four months imprisonment followed by three years of supervised release is "sufficient, but not greater than necessary" to accomplish the sentencing goals identified in § 3553(a). While the requested sentence is below the preliminary sentencing-guideline range calculated by probation, Docket Entry Number ("DE") 47:18 (sentence guideline range of 87 to 108 months imprisonment),[1] the sentence Mr. Romero requests is both reasonable and meets the goals of sentencing as defined in § 3553(a).

---

[1] Mr. Romero has objected to Probations' calculation of the applicable sentencing guidelines. DE 50:4 (Mr. Romero's sentencing guideline range is 70 to 87 months).

# I. THE SENTENCING GUIDELINES DO NOT AND SHOULD NOT CONTROL THIS CASE

A sentence within the guideline range currently listed in the PSR would be greater than necessary to meet the sentencing goals of § 3553(a). Rather, considering the nature of the offense in this instance, a sentence of twenty-four months imprisonment, coupled with three years of supervised release would be sufficient to meet the sentencing goals of § 3553(a). A fundamental pillar of the sentencing process is the recognition that the punishment should consider both the crime of conviction, as well as the offender. *Williams v. New York*, 337 U.S. 241, 247 (1949). This determination includes the mandate that each sentencing judge view each case "as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113 (1996). This principle has been codified by Congress into the United States Code in several areas, making it clear that there should be no limitation on a sentencing judge's ability to consider information relevant to the sentencing process, and mandating a consideration of the unique history and characteristics of each defendant. *See* 18 U.S.C. § 3661; § 3553(a)(1).

The Supreme Court has reaffirmed a sentencing court's freedom, indeed its obligation, to consider the entire universe of facts in a defendant's life. "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011). A district court must impose a sentence that is "sufficient but not greater than necessary" to meet the goals of the Sentencing Reform Act. § 3553(a)(1).

While the advisory guideline range is a factor the Court must consider when imposing a sentence, both law and conscience dictate that this range should not be the only factor. The sentencing guidelines and its commentary are merely two of many factors a court must consider in

crafting a reasonable sentence. 18 U.S.C. § 3553(a)(4), (5). "[T]he Guidelines should be the starting point and the initial benchmark." Section 3553(a) requires courts to consider the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed --
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing [guideline] range [];
>
> (5) any pertinent policy statement[s of the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Section 3553(a) makes abundantly clear that this Court, when considering what sentence is appropriate for Mr. Romero in this case, is not bound to blindly follow the sentencing guidelines. Instead, the history of sentencing in this country mandates that this Court look at Mr. Romero as an individual and fashion a sentence that is appropriate for him and him alone. To that end, what is a reasonable sentence may, in fact, be different from what the guidelines might otherwise suggest. This has been noted and approved numerous times since the sentencing guidelines were deemed advisory. *See, e.g., Gall v. United States*, 552 U.S. 38, 49 (2007) (approving probationary sentence where the guideline range was 30-37 months imprisonment); *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (a district court may reasonably impose a below-guideline sentence based on the

notorious crack-powder cocaine disparity); *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (Emphasis in original). Simply, "[t]here are[ ] many instances where the guideline range will not yield a reasonable sentence." *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006).

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

## II. MR. ROMERO SHOULD BE SENTENCED TO SERVE TWENTY-FOUR MONTHS

While the advisory guideline range is a significant factor to any sentence, both law and conscience dictate that this range should not be the only factor. Considering Mr. Romero as an individual leads to the conclusion that twenty-four months of imprisonment followed by three of supervised release is "sufficient but not greater than necessary" to meet the goals of the Sentencing Reform Act. § 3553(a)(1).

### A. Personal History and Characteristics.

Mr. Romero has grown up in an environment of poverty, violence, and substance abuse. Mr. Romero's mother was just 17 when she had him, and his father was not much older – 18. His parents' relationship was volatile; severe domestic violence – often requiring law enforcement intervention – was rampant. Mr. Romero remembers law enforcement often taking his father to jail. Unsurprisingly, Mr. Romero's parents divorced. Initially, Mr. Romero lived with his father. But that ended when he

was three or four because of domestic violence. The state took him away. Mr. Romero had spent significant amounts of time in community corrections due to his violence.

Mr. Romero's mother eventually obtained custody of Mr. Romero and his sister. But she struggled to take care of him and his siblings. She had to work multiple jobs just to maintain meager living arrangements. Mr. Romero's father was of no help. Money was tight and tensions were high. Mr. Romero's mother starting abusing methamphetamine.

Mr. Romero's father finally was able to get his act together and came back into Mr. Romero's life when he was eight or nine – albeit intermittently. His father married another woman who Mr. Romero regarded as his stepmother. But his stepmother was also violent, and like his mother, had a drug problem. Mr. Romero's father also developed an addiction to methamphetamine.

By the time Mr. Romero was barely in his teenage years, his father kicked him out of the house. Understandably, Mr. Romero became angerly rebellious. The only examples he had of dealing with his problems was violence. His father abused his mother, he abused his stepmother, and Mr. Romero was abused. Based on that example, Mr. Romero was taught that was how a person dealt with anger issues. Feeling alone, Mr. Romero looked for acceptance and family; he joined the Norteños gang. Unfortunately, that is where he found the acceptance and family he was looking for. Luckily, Mr. Romero's rebellion and aggression did not result in substance abuse issues.

Eventually Mr. Romero was able to move in with his grandmother and stayed with her until he was 18. She was able to push Mr. Romero to get his GED and tried direct his aggression in more constructive activities – kickboxing and jiu jitsu.

Mr. Romero's involvement with the Norteños, coupled with his anger issues, led him down a dark path. Mr. Romero was violent and dangerous. But that changed when he was sent to prison in 2015. Mr. Romero started to reflect on his life, where he was, and where he wanted to go. He

started attending several self-help classes for which he earned multiple certificates.[2] Mr. Romero was so proud of his accomplishments; he has kept his certificates – a constant reminder that he can do better. More importantly, Mr. Romero decided it was time to leave the gang life behind; he wanted to build a stable and productive life – a law abiding life. He wanted to stay away from the violence and destruction that went along with the gang life.

As part of that transition, Mr. Romero started to look for work. He could not shake his past however. The work he could find was seasonal and sporadic at best. Choosing felony friendly employers, Mr. Romero would apply for work with anyone. When he was given an interview, many of the employers would tell him they could (or would) not hire him. It was a constant struggle for Mr. Romero to find work and remain employed. Mr. Romero remained committed to living a law-abiding life and, despite his difficulties, he never returned to the gang life.

Mr. Romero eventually reconnected with his family and formed a family of his own.[3] Romero met Jolene and they eventually got married. Ms. Romero has been a positive influence, always supporting Mr. Romero and his desire to stay out of the gang life. While they do not have children of their own, Ms. Romero has three children that Mr. Romero considers his own. Impressively, Mr. Romero is best friends with the children's father. Together, they have raised the children in a happy and healthy home.

The struggle to maintain employment and pay the mounting bills took a toll. He couldn't find work and Mr. Romero was not making enough to cover all the necessities. The stress of trying to provide for his family came to head when he and Ms. Romero could not provide a Christmas for

---

[2] Those certificates are attached as Exhibit "A."
[3] Mr. Romero's family have written several letters supporting him. Those letters are attached as Exhibit "B." Many of those family members will also speak at his sentencing hearing.

their children. He could not buy a Christmas tree, let alone any presents for the kids. That was the straw that broke the camel's back.

Without any employment prospects, and frustrated, Mr. Romero saw one way out. He contacted some people he knew and started being the middleman between a supplier of drugs and those who were going to sell them. Mr. Romero had never sold drugs before, nor had he acted as a middleman. It was something Mr. Romero felt was necessary just to get by because he felt he had no other choice. Mr. Romero would receive the drugs in packages from Mexico and someone would come and get them. Mr. Romero did not use the money to live a high lifestyle, just to pay the bills and provide his family a Christmas.

Notably, Mr. Romero still did not turn back to the gang life, nor did he engage in any acts a violence. He left that life behind. Mr. Romero got stuck in an impossible situation and turned to the only thing – the wrong thing – he could find.

### B. Seriousness of the Offense, Promoting Respect for the law, and Provide Just Punishment for the Offense.

Mr. Romero's conduct in this case is a personification of the problems inherent in reintegration back into the community we, as a society, expect from those who serve time in prison. No doubt, Mr. Romero wanted to get out and lead a productive life. But, Mr. Romero was marked with a scarlet "A" (a felon), and he found insurmountable obstacles to continue down an acceptable path. No doubt, Mr. Romero's crimes are serious. But there was no violence. The question becomes, what promotes respect for the law and provides just punish for this offense. Mr. Romero is a unique individual. His history does not involve dealing drugs; his history is a product of his involvement with the Norteños. Understanding Mr. Romero's unique circumstances – his actions in this case – makes it clear: Mr. Romero needs help learning to provide for his family without resorting to selling drugs.

Mr. Romero has shown that programming has worked in the past – the programming he undertook while at the DOC helped him make the decision to leave the violence inherent in gang life behind. It also shows that further programming focused on employment skills and finding consistent employment will work, just his prior programming has done in the past. Again, the root cause of the crime for which he is being sentenced is his inability to find and maintain stable employment. Focusing on providing Mr. Romero with necessary skills to find stable employment in his situation – employment that allows him to provide for his family – is the best way to promote respect for the law, deter any future criminal activity, and provide general deterrence. As to the public, it would show that working hard to build the appropriate life, embracing the programming that supervised release can provide, leads to good results. For Mr. Romero, it does the same. It provides him the proper tools and motivation to lead the type of life he wants – law-abiding and productive.

Further, sentencing Mr. Romero to more than twenty-four in prison would be counterproductive; it would create a significant break in his relationship with his family and just further his bleak prospects for providing for his family. It would also put him in a situation where he will not be getting the advanced programming he needs. It is well documented that life in prison is violent because it is focused on politics and superiority. As much as Mr. Romero wants to stay away from that, he will still have to survive in prison. He will not be focused on learning what he needs, he will be focused on survival. A lengthy prison sentence will styme Mr. Romero's ability to progress toward his – and the community's – goal of becoming a productive member of society.

Simply put, a sentence of twenty-four months imprisonment followed by three years of supervised release, with the condition that he receive and participate in employment training, is sufficient "to reflect the seriousness of the offense, . . . promote respect for the law," and "to provide just punishment . . . ." in this case. § 3553(a)(2)(A). Again, the criminal activity in which Mr. Romero

has engaged has been the direct result of his inability to provide for his family. Providing Mr. Romero with skills he needs to gain and maintain employment is essential to ensuring this kind of thing does not happened again.

III. CONCLUSION

Mr. Romero respectfully requests the Court, considering his unique circumstances, impose a sentence of twenty-four months imprisonment followed by three years of supervised release, because such a sentence is sufficient, but not greater than necessary, to satisfy the factors specified in § 3553(a).

Respectfully submitted, this 3rd day of July, 2023.

>VIRGINIA L. GRADY
>Federal Public Defender
>
>/s/ *Jared Scott Westbroek*
>JARED SCOTT WESTBROEK
>Assistant Federal Public Defender
>633 17th Street, Suite 1000
>Denver, CO  80202
>Telephone: (303) 294-7002
>FAX: (303) 294-1192
>Email:  jared_westbroek@fd.org
>Attorney for Mr. Romero

# CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2023, I electronically filed the foregoing **ANTHONY JAMES ROMERO'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE/DEPARTURE TO A SENTENCE OF TWENTY-FOUR MONTHS' IMPRISONMENT FOLLOWED BY THREE YEARS OF SUPERVISED RELEASE** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Peter Grattan Hautzinger, Assistant United States Attorney
Email: peter.hautzinger@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Anthony James Romero (Via U.S. Mail)

/s/ *Jared Scott Westbroek*
JARED SCOTT WESTBROEK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email:  jared_westbroek@fd.org
Attorney for Mr. Romero